**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VAXCEL INTERNATIONAL CO., LTD., | ) ) | |
| | ) | C.A. No.  20-224-LPS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HEATHCO LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

Frederick L. Cottrell III (#2555)
Katharine Lester Mowery (#5629)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
mowery@rlf.com

*Attorneys for Plaintiff Vaxcel International
Co., Ltd.*

OF COUNSEL:
R. Mark Halligan
FisherBroyles, LLP
203 North LaSalle Street, Suite 2100
Chicago, Illinois 60601
(312) 607-0102
rmark.halligan@fisherbroyles.com

Richard M. Lehrer
FisherBroyles, LLP
109 Normandy Drive
Woodstock, GA 30188
(845) 519-9525
Richard.lehrer@fisherbroyles.com
Dated:  July 19, 2021

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendant HeathCo LLC*

OF COUNSEL:
David C. Radulescu, Ph.D.
Etai Lahav
Michael Sadowitz
Radulescu LLP
5 Penn Plaza, 19th Floor
New York, NY 10001
(646) 502-5950
david@radip.com
etai@radip.com
mike@radip.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................................v

I.    INTRODUCTION AND BACKGROUND .........................................................................1

    a.    Plaintiff's Introductory Remarks .............................................................................1

        i.    THE SUIT PATENTS.....................................................................................1

            1.    U.S. Patent No. 10,136,503 (the "'503 Patent") ...........................1
            2.    U.S. Patent Nos. 10,187,947 (the "'947 Patent"), 10,491,032 (the "'032 Patent"), 9,326,362 (the "'362 Patent"), 10,225,902 (the "'902 Patent"), 10,516,292 (the "'292 Patent"), 10,763,691 (the "'691 Patent"), 10,770,916 (the "'916 Patent").....................................1
            3.    U.S. Patent No. 9,326,362 (the "'362 Patent") ..............................3
            4.    U.S. Patent Nos. 10,154,564 (the "'564 patent"), 10,667,367 (the "'367 patent")............................................................................4
            5.    U.S. Patent No. 9,560,719 (the "'719 Patent") ..............................4

    b.    Defendant's Introductory Remarks...........................................................................5

    c.    Plaintiff's Reply Remarks.........................................................................................6

II.   LEGAL STANDARD ........................................................................................................6

    a.    Plaintiff's Opening Position......................................................................................6

III.  POTENTIALLY AGREED CONSTRUCTIONS ................................................................8

IV.   DISPUTED CLAIM TERMS ............................................................................................9

    a.    "Detection Device" ...................................................................................................9

        i.    Plaintiff's Opening Position .........................................................10
        ii.   Defendant's Answering Position ..................................................11
        iii.  Plaintiff's Reply Position .............................................................15
        iv.   Defendant's Sur-Reply Position ...................................................19

    b.    "Message Carrying Sensing Signal"........................................................................20

        i.    Plaintiff's Opening Position .........................................................21
        ii.   Defendant's Answering Position...................................................22
        iii.  Plaintiff's Reply Position .............................................................23
        iv.   Defendant's Sur-Reply Position...................................................24

c.    "External Control Signal" ..................................................................................25

        i.    Plaintiff's Opening Position ....................................................................25
        ii.   Defendant's Answering Position..............................................................26
        iii.  Plaintiff's Reply Position ........................................................................30
        iv.   Defendant's Sur-Reply Position...............................................................31

d.    "Loading And Power Control Unit" ..............................................................32

        i.    Plaintiff's Opening Position ....................................................................32
        ii.   Defendant's Answering Position..............................................................33
        iii.  Plaintiff's Reply Position ........................................................................36
        iv.   Defendant's Sur-Reply Position...............................................................37

e.    "A Voltage V Across Each LED Complies with an Operating Constraint of
        Vth<V<Vmax Featuring Electrical Characteristics of the LED" ..............................38

        i.    Plaintiff's Opening Position ....................................................................38
        ii.   Defendant's Answering Position..............................................................39
        iii.  Plaintiff's Reply Position ........................................................................42
        iv.   Defendant's Sur-Reply Position...............................................................45

f.    "Connected in Parallel"...................................................................................46

        i.    Plaintiff's Opening Position ....................................................................47
        ii.   Defendant's Answering Position..............................................................48
        iii.  Plaintiff's Reply Position ........................................................................49
        iv.   Defendant's Sur-Reply Position...............................................................50

g.    "Wherein the First Switching Device and the Second Switching Device are
        Connected with the First Set of N Number LEDs and the Second Set of M
        Number LEDs" ................................................................................................52

        i.    Plaintiff's Opening Position ....................................................................52
        ii.   Defendant's Answering Position..............................................................53
        iii.  Plaintiff's Reply Position ........................................................................54
        iv.   Defendant's Sur-Reply Position...............................................................55

h.    "Creation of an Aesthetic Night Scene/Soft Evening Light to Feature an
        Aesthetic Night View Around the Living Area both for Indoor and Outdoor
        Need/Soft and Warm Light to Feature an Aesthetic Night View Around the
        Living Area Both for Indoor and Outdoor Need"......................................................55

        i.    Plaintiff's Opening Position ....................................................................56
        ii.   Defendant's Answering Position..............................................................57
        iii.  Plaintiff's Reply Position ........................................................................59

iv.    Defendant's Sur-Reply Position ........................................................60

i.    "Creation of a Navigation Capacity Similar to a Light House for Guiding People to Safely Walk to a Destination in an Outdoor Living Area/ Create a Navigation Capacity Similar to a Light House to Help People Move to a Destination Without Getting Lost or Encountering an Accident" ...........................61

    i.    Plaintiff's Opening Position ...............................................................61
    ii.    Defendant's Answering Position ........................................................62
    iii.    Plaintiff's Reply Position ...................................................................62
    iv.    Defendant's Sur-Reply Position ........................................................63

j.    "Low/High [Light] Color Temperature" .........................................................64

    i.    Plaintiff's Opening Position ...............................................................64
    ii.    Defendant's Answering Position ........................................................65
    iii.    Plaintiff's Reply Position ...................................................................68
    iv.    Defendant's Sur-Reply Position ........................................................69

k.    "Much Brighter Day Light" ..............................................................................69

    i.    Plaintiff's Opening Position ...............................................................69
    ii.    Defendant's Answering Position ........................................................70
    iii.    Plaintiff's Reply Position ...................................................................70
    iv.    Defendant's Sur-Reply Position ........................................................71

l.    "Dual Effect of Security Alert by Means of Creating Drastic Changes in Both Light Intensity From Low to High and Light Color Temperature From Warm to Cool Upon Detecting a Motion Intrusion" ........................................................72

    i.    Plaintiff's Opening Position ...............................................................72
    ii.    Defendant's Answering Position ........................................................73
    iii.    Plaintiff's Reply Position ...................................................................74
    iv.    Defendant's Sur-Reply Position ........................................................75

m.    "Preloaded In A Mobile Device" ......................................................................76

    i.    Plaintiff's Opening Position ...............................................................76
    ii.    Defendant's Answering Position ........................................................77
    iii.    Plaintiff's Reply Position ...................................................................78
    iv.    Defendant's Sur-Reply Position ........................................................79

n.    "When a Free Setting Motion of the Free Setting Operator is Ceased, the User Interface APP Manages to Generate the [At Least One] Operating Variable Corresponding to [the Selection of] the Capacity Operating Rate [Being Determined] and Accordingly Operates to Transmit a Wireless Instruction

iv

Signal Carrying a Message of the [At Least One] Operating Variable to the Lighting Device" ...................................................................................................79

    i.    Plaintiff's Opening Position ...............................................................80
    ii.   Defendant's Answering Position...........................................................81
    iii.  Plaintiff's Reply Position ...................................................................83
    iv.  Defendant's Sur-Reply Position............................................................84

V.  CONCLUSION ...............................................................................................85

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*ACQIS LLC v. Alcatel-Lucent USA Inc.*,
No. 6:13-cv-638, 2015 WL 1737853 (E.D. Tex. April 13, 2015) ...........................................64

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016).................................................................................33, 34, 37

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012).............................................................................................6

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017).............................................................................................23

*Baxter International, Inc. v. Becton, Dickinson and Co.*,
2020 WL 5191495 (N.D. Ill. March 18, 2020) .........................................................................74

*Bell Northern Research, LLC v. CoolPad Tech, Inc.*,
2019 WL 3766688 (S.D. Cal. Aug. 9, 2019) ..........................................................................15

*Chef America, Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004).................................................................................52, 54, 55

*Clinical Innovations, LLC v. Utah Medical Products, Inc.*,
2007 WL 2688246 (D. Utah, Sept. 11, 2007) .........................................................................12

*Competitive Techs., Inc. v. Fujitsu Ltd.*,
185 Fed. App'x 958 (Fed. Cir. 2006).......................................................................................39

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005).............................................................................................57

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
257 F.3d 1364 (Fed. Cir. 2001).............................................................................................7

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019).............................................................................................7

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996)...........................................................................................62, 70

*Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*,
839 Fed. App'x 500 (Fed. Cir. 2021).....................................................................................29

*Hormone Research Found. v. Genentech, Inc.*,
904 F.2d 1558 (Fed. Cir. 1990).............................................................................................7

*HTC Corp. v. IPCom GmbH & Co.*,
  667 F.3d 1270 (Fed. Cir. 2012)......................................................................................8

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
  802 F.2d 1367 (Fed. Cir. 1986)....................................................................................59

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019)................................................................................29, 30

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
  2018 WL 5809270 (E.D. Tex. Nov. 6, 2018) ..............................................................58

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)....................................................................................11

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)........................................................................26, 57, 66

*Luminara Worldwide, LLC v. Liown Elecs. Co., Ltd.*,
  814 F.3d 1343 (Fed. Cir. 2016)....................................................................................22

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008)....................................................................................37

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
  800 F.3d 1366 (Fed. Cir. 2015)....................................................................................26

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014).......................................................................................57, 62, 63, 70

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).................................................................................6, 7, 8

*In re Power Integrations, Inc.*,
  884 F.3d 1370 (Fed. Cir. 2018)....................................................................................37

*Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*,
  813 F. App'x 557 (Fed. Cir. 2020) ..............................................................................36

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001)......................................................................................7

*Signal IP v. Am. Honda Motor Co., Inc.*,
  2015 WL 5768344 (C.D. Cal. Apr. 17, 2015) .............................................................67

*Thorner v. Sony Comput. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)................................................................................77, 78

*TQ Delta, LLC v. 2Wire, Inc.*,
   2018 WL 626472 (D. Del., Jan. 30, 2018).........................................................................11, 14

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
   753 F.3d 1375 (Fed. Cir. 2014).......................................................................................14

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).........................................................................................7

*In re Walter*,
   698 Fed. App'x 1022 (Fed. Cir. 2017)............................................................................68

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir 2015) (en banc)................................................................. passim

**STATUTES & RULES**

35 U.S.C. § 112.......................................................................................................... passim

I.      **INTRODUCTION AND BACKGROUND**

a.      **Plaintiff's Introductory Remarks**

i.      **THE SUIT PATENTS**

1.      **U.S. Patent No. 10,136,503 (the "'503 Patent")**

The '503 Patent entitled "Microcontroller-Based Multifunctional Electronic Switch and Lighting Apparatus Having the Same," issued on November 20, 2018.

At least one embodiment of the '503 Patent is generally directed to a lamp having 2 sets of LEDs, each of which is controllable through a respective switching element, and each of which respectively emits light with a different color temperature (e.g. a color temperature of 3000K which is a warm color and 5700K which is a cool color). (D.I. 64-1 Exhibit A, Col. 24, ln. 67 - Col. 25 ln. 5).  As a result, the lamp can emit light with a range of color temperatures; namely when the first set of LEDs is on and the second set is off, when the first set of LEDs is off and the second set is on and when both sets of LEDs are on depending on which set is more prevalent (*Id.* at Col. 7, ll. 14 - 33).  The color temperature may be selected/tuned by operation of a detection device, which generates a signal interpretable by a controller.  (*Id.* at Col. 25, ll. 21 - 48).  The controller, based on the received signal, controls the switching elements to control the electric power transmitted to each of the sets of LEDs. (*Id.* at Col. 25, ll. 5-21).

2.      **U.S. Patent Nos. 10,187,947 (the "'947 Patent"), 10,491,032 (the "'032 Patent"), 9,326,362 (the "'362 Patent"), 10,225,902 (the "'902 Patent"), 10,516,292 (the "'292 Patent"), 10,763,691 (the "'691 Patent"), 10,770,916 (the "'916 Patent")**

The '947 Patent entitled "Life-Style LED Security Light," issued on January 22, 2019, and the '032 Patent entitled "LifeStyle Security Light," issued on November 26, 2019.  The '902 Patent entitled "Two-Level Security Light with Motion Sensor," issued on March 5, 2019.  The '292, '691 and '916 Patents each entitled "Two-Level LED Security Light with Motion Sensor," issued

on December 24, 2019, September 1, 2020 and September 8, 2020, respectively. These patents (collectively, the '392 Continuations) claim priority to U.S. Patent No. 8,866,392 (the "'392 Patent") as such share disclosure even though they do not share the same claims.

At least one embodiment of the '392 Continuations is generally directed to an LED security light that emits light at different intensities. The security light receives AC power and converts the AC power to DC power to operate the LEDs. (D.I. 64-1 Exhibit B, Fig. 1B, Col. 5, ll. 4 - 7). The security light, *inter alia*, includes a motion detector and a light sensor. (*Id.* at Col. 5, ll. 23 - 26). When the light sensor detects that the ambient light falls below a predetermined value (e.g. at dusk), it signals a controller to operate switching circuitry to turn the security light on at a low-level illumination. When the light sensor detects that the ambient light rises above a predetermined value (e.g. at dawn), it signals the controller to operate the switching circuitry to turn the light off. (*Id.* at Col. 5, ll. 31- 42). While in the low-level illumination mode, if the motion sensor detects motion it signals the controller to operate the switching circuitry to switch the illumination level to a high-level illumination for a time. (*Id.* at Col. 5, ll. 42 -51). The security light also includes a timer that can change/set the amount of time the security light stays on at the low-level illumination and/or at the high-level illumination. (*Id.* at Col. 6, ll. 39 – 47).

At least one embodiment of the '392 Continuations is generally directed to a security light having 2 sets of LEDs, each of which is controllable through a respective switching element, and each of which respectively emits light with a different color temperature (e.g. a color temperature of 2700K which is a warm color and 5000K which is a cool color), and different light intensities. (D.I. 64-2 Exhibit E, Fig. 1D, Col. 8, ll. 9 – 29, Col. 14, ll. 59 – 64, Exhibit F, Fig. 1D, Col. 8, ll. 18-36). The security light, *inter alia*, includes a motion detector and a light sensor. (*Id.* Exhibit E at Fig. 1D, Col. 2, ll. 3 – 7, Exhibit F at Fig. 1D, Col. 2, ll. 5 – 9). When the light sensor detects

that the ambient light falls below a predetermined value (e.g. at dusk), it signals a controller to operate switching circuitry to turn on a first set of LEDs at a low-level illumination and a low color temperature.  (*Id.* Exhibit E, at Col. 14, ll. 37 – 47, Exhibit F at Col. 14, 51 - 55). When the light sensor detects that the ambient light rises above a predetermined value (e.g. at dawn), it signals the controller to operate the switching circuitry to turn the security light off.  (*Id*. Exhibit E, at Col. 5, ll. 51- 54, Exhibit F, at Col. 5, ll. 51 – 54).  While the security light is operating at the low-level illumination, if the motion sensor detects motion it signals the controller to operate the switching circuitry to switch on a second set of LEDs at a high-level illumination and a high color temperature for a preset amount of time.  (*Id.* Exhibit E, at Col. 5, ll. 54 – 58, Col. 14, ll. 51 – 54, Exhibit F, at Col. 5, ll. 54 – 59, Col. 14, ll. 62 - 65).

### 3.    U.S. Patent No. 9,326,362 (the "'362 Patent")

The '362 Patent entitled "Two-Level LED Security Light with Motion Sensor," issued on April 26, 2016 claims priority as a continuation-in-part to U.S. Patent No. 8,866,392.

At least one embodiment of the '362 Patent, in relevant part, is generally directed to a security light, *inter alia*, having at least one LED, a controller, a semiconductor switching device, a motion detector and a light sensor. (D.I. 64-1 Exhibit D, Fig. 2A, Col. 1, ll. 56 - 61).  The controller has program codes which cause the controller to output a PWM signal to the semiconductor switching device to control the conduction period and the cut-off period of the switching device. (*Id*. at Fig. 2A, Col. 1, ln. 62 – Col. 2, ln, 16).  The controller controls the semiconductor switching device to have a short conduction period and a long conduction period such that the LED generates a first level and a second level illumination having different light intensities. (*Id.* at Fig. 2B, Col. 5, ln. 64 – Col. 6, ln. 15). The external control unit can manually set/change an illumination characteristic (e.g. the light intensity) of the at least one LED generating the first level and/or the second level illumination. (*Id*. at Col. 6, ll. 32 – 45).

3

**4.      U.S. Patent Nos. 10,154,564 (the "'564 patent"), 10,667,367 (the "'367 patent")**

The '564 Patent entitled "App Based Free Setting Method for Setting Operating Parameter of Security Light," issued on December 11, 2018 as a continuation in part of the '719 Patent. The '367 Patent, also entitled "App Based Free Setting Method for Setting Operating Parameter of Security Light," issued on May 26, 2020 as a continuation of the '564 Patent.

At least one embodiment of the '564 Patent is generally directed to a software application ("App") for setting an operating parameter (i.e. timer, light intensity, color temperature or detection sensitivity) of the security light. (D.I. 64-2 Exhibits I and J, Figs. 7, 7A-7G, 11). The App, employs a touch screen to receive a user's selection and transform that decision into an operating variable which the mobile device wirelessly transmits to the security light. (*Id*. Exhibit I at Fig. 7, 8A, 9, Col. 3, ll. 46 – 58, Exhibit J, Col. 3, ll. 48 – 60). A controller in the security device receives the operating variable and outputs at least one control signal to control and set the selected operating parameter. (*Id*. Exhibit I at Col. 26, ll. 10 – 16, Col. 27, ll. 36 – 52, Exhibit J, Col. 26, ll. 22 – 28, Col. 27, ll. 22 – 38). The value of the operating parameter is stored in memory for repetitive use until replaced by a new selected operating parameter. (*Id*. Exhibit I at Col. 5, ll. 35 – 40, Exhibit J, at Col. 5, ll. 37 – 42). The App provides a visualization of a capacity scale for the operating parameter and calculates/selects and displays the current value of the operating rate selected by the user. (*Id*. Exhibit I at Figs. 7, 7A-7G, 9, 11, Col. 22, ll. 33 – 67, Exhibit J, at Figs. 7, 7A-7G, 9, 11, Col. 22, ll. 19 - 35).

**5.      U.S. Patent No. 9,560,719 (the "'719 Patent")**

The '719 Patent entitled "LED Security Light and LED Security Light Control Device Thereof," issued on January 31, 2017 and is a continuation-in-part of U.S. Patent No. 8,866,392.

4

At least one embodiment of the '719 Patent is generally directed to a security light, *inter alia*, having at least one LED, a controller, a semiconductor switching device, a motion detector, a light sensor and an external control unit. (D.I. 64-2 Exhibit K, Figs. 1, 2A, Col. 1, ln. 60 – Col. 2, ln. 20).  The controller outputs a control signal to the semiconductor switching device to control the conduction rate of the switching device such that the LED emits light at different light intensities. (*Id.* at Col. 2, ll. 4 - 20, Col. 4, ll. 21 - 35). When the light sensor detects that the ambient light falls below a predetermined value (e.g. at dusk), it signals a controller to turn on at least one LED at a first light intensity. (*Id.* at Col. 2, ll. 4 – 20, Col. 4, ll. 38 – 41, Col. 7, ll. 55 - 61).  When the light sensor detects that the ambient light rises above a predetermined value (e.g. at dawn), it signals the controller to turn the security light off.  (*Id.* at Col. 4, ll. 38 – 41, Col. 7, ll. 55 - 61).  While the LED is emitting light at the first light intensity, if the motion sensor detects motion it signals the controller to operate the LED at a second, higher intensity for a predetermined time after which the LED is returned to emitting light at the first intensity.  (*Id.* at Col. 2, ll. 4 – 20, Col. 4, ln. 67 – Col. 5, ln. 9, Col. 7, ll. 55 - 61).  The second intensity is always higher than the first intensity.  (*Id.* at Col. 4, ll. 31 - 35).  The light intensity of the at least one LED can be adjusted/set with the external control unit. (*Id.* at Col. 5, ll. 35 – 58).

### b.      Defendant's Introductory Remarks

HeathCo LLC's ("HeathCo" or Defendant") constructions stay true to the evidence and follow the relevant case law.  Many claim terms are indefinite because the specifications often fail to provide objective boundaries, particularly for terms that are entirely subjective, and are internally inconsistent.  Vaxcel International Co., Ltd.'s ("Vaxcel" or "Plaintiff") constructions, in contrast, are litigation-driven and ignore most of the evidence.  For instance, Vaxcel eviscerates the meaning of the well-known electrical engineering term "connected in parallel" such that it

5

reads on components in series, but components cannot be both in parallel and in series with one another.  Vaxcel's baseless constructions should be rejected.[1]

### c.    Plaintiff's Reply Remarks

Vaxcel hereby responds to HeathCo's Claim Construction answering position (HeathCo's "Answering Position"), which is rife with inaccurate, self-serving, and inconsistent statements. HeathCo's Answering Position requests the Court to adopt an overly narrow and inaccurate claim construction to assist HeathCo with its non-infringement arguments.  The Court should reject HeathCo's proposed claim constructions.

HeathCo's proposed claim constructions are also generally contrary to the law and to the teachings of the Suit Patents.  Indeed, HeathCo seeks to have this Court improperly limit the scope of the claims by its wholesale importing of limitations into the disputed claim terms.

The following analysis demonstrates that HeathCo's Answering Position violates various well-established canons of claim construction. Accordingly, Plaintiff Vaxcel respectfully requests that the Court reject HeathCo's proposed claim constructions and adopt Vaxcel's claim constructions.

## II.    LEGAL STANDARD

### a.    Plaintiff's Opening Position

The Federal Circuit has repeatedly held that the "words of a claim 'are generally given their ordinary and customary meaning,'" and "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012).

---

[1] HeathCo and Vaxcel agree that common terms across multiple patents should have the same meaning.  *See infra* at 9.

Intrinsic Evidence. Intrinsic evidence (the claims, specification and the prosecution history), is the most significant source of the meaning of disputed claim language. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In fact, the intrinsic evidence alone will often resolve any ambiguity, thereby rendering it improper to rely on extrinsic evidence. *Id.* at 1583 (citing *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216, (Fed. Cir. 1995)).

Claim Language. The starting point for any claim construction analysis is the language of the claims themselves (including unasserted and asserted claims), for this language "define[s] the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d. at 1312; *see also Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990).

The Patent Specification. Claims do not stand alone — they are part of "'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). The specification is always highly relevant and usually dispositive; indeed, it "is the single best guide to the meaning of a disputed term." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001) (quoting *Vitronics*, 90 F.3d 1582 (Fed. Cir. 1996)). However, it is "one of the cardinal sins of patent law" to read a limitation from the specification into the claims. *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

The Prosecution History. The prosecution history consists of the complete record of the proceedings before the Patent Office "from the first application papers to the issued patent." *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019). It also "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Moreover, it can inform the meaning of the claim language by demonstrating if the inventor

limited the invention during prosecution by making the claim scope narrower than it otherwise would be. *Id.* Nevertheless, while the prosecution history can offer insight into the meaning of a claim term, the claim language and the specification generally carry greater weight. *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1276 (Fed. Cir. 2012).

## III.    POTENTIALLY AGREED CONSTRUCTIONS

The parties disagree as to whether these terms must be construed. If construed, then the parties agree on the construction.

| Term No. | Identifying Party/Claim Term/Claim No(s). | Plaintiff's Proposed Construction/Intrinsic Evidence | Defendant's Proposed Construction/Intrinsic Evidence |
|---|---|---|---|
| 1. | H. **Free-Running Setting** '362 Patent, claims 1, 2 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: A program that allows a user to set the illumination level as it cycles through a sequence of values within a preset range | A program that allows a user to set the illumination level as it cycles through a sequence of values within a preset range |
| 2. | H. **Connected in Series** '947 Patent, claims 20, 24 '902 Patent, claim 23 '032 Patent, claim 2 '362 Patent, claim 1 '292 Patent, claims 15, 23, 36, 79, 80, 81 '691 Patent, claims 1. 2, 59, 77 '916 Patent, claims 1, 2 '719 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the parties agree that the construction should be: Connected so that the same current passes through each element individually | Connected so that the same current passes through each element individually |

8

| Term No. | Identifying Party/Claim Term/Claim No(s). | Plaintiff's Proposed Construction/Intrinsic Evidence | Defendant's Proposed Construction/Intrinsic Evidence |
|---|---|---|---|
| 3 | H. **Wherein When the Second Set of M Number LEDs is Turned On Upon Detecting the Motion Intrusion, the Loading and Power Control Unit Manages to Turn Off the First Set of N Number LEDs** '902 Patent, claim 17 '292 Patent, claim 17 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: When the second set of M number LEDs is turned on as a result of motion being detected, the loading and power control unit turns off the first set of N number LEDs. | When the second set of M number LEDs is turned on as a result of motion being detected, the loading and power control unit turns off the first set of N number LEDs. |

## IV.    DISPUTED CLAIM TERMS

**Plaintiff's Position:**  As detailed above, most of the asserted patents are continuations or continuations-in-part of the same parent application.  As such, many of the term across the different patents are common.

### a.    "Detection Device"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| V/H. **Detection Device** '503 Patent, Claims 1, 8, 20, 40, 53 | One or more touch and/or touchless devices such as but not limited to an infrared sensor, an electrostatic induction sensor, a conduction-based sensor, a pad, button, voltage divider or power interruption switch or a conduction rate of a phase controller set by a user that serves as an interface between a human and the controller. | Means-plus-function Function: "detecting at least one external control signal and converting the at least one external control signal into at least one message carrying sensing signal" Structure: Indefinite |

### i.     Plaintiff's Opening Position

The phrase "detection device" is found in the '503 Patent claims.  For example, claim 1 recites "…detection device, for detecting at least one external control signal and converting said…external control signal into at least one message carrying sensing signal…"

The specification of the '503 Patent discloses that the detection device "serves as an interface between human and the electronic switch to convert the external control signal into the message carrying sensing signal readable and interpretable to the micro controller." (D.I. 64-2 Exhibit A, Col. 25, ll. 21 – 24).  The '503 patent further specifies the detectors considered by the inventor:

> The detection device [] may be configured as **touch less interface and direct touch interface**. The touch less interface may be implemented by a wireless method to receive wireless external control signal and convert the wireless external control signal into the message carrying sensing signal readable and interpretable to the microcontroller. The wire-less external control signal can be transformed from a motion signal generated with an **infrared ray motion sensor**, or it can be an electromagnetic wireless signal generated with a wireless receiver or transceiver, or it can be trans-formed from a voice signal generated with an A.I. (artificial intelligence) based device. The **direct touch interface** on the other hand uses a wired method to receive the external control signal set by an user, wherein the external control signal can be generated from **a push button, a touch pad, a voltage divider, or a power interruption switch or button operated by the user, or a conduction rate of a phase controller set by the user**, wherein, if the external control signal is an analogue signal, a conversion circuitry may be included in the detection device or as a virtual circuitry programmable embedded in the microcontroller to convert the analogue signal into the message carrying sensing signal readable and interpretable to the microcontroller. (*Id.* at Col. 25, ll. 24 – 48) (Emphasis Added)

Considering the foregoing, there is nothing ambiguous about the phrase "detection device" and Vaxcel respectfully submits that the phrase should be construed to mean "**One or more touch and/or touchless devices such as but not limited to an infrared sensor, an electrostatic induction sensor, a conduction-based sensor, a pad, button, voltage divider or power**

**interruption switch or a conduction rate of a phase controller set by a user that serves as an interface between a human and the controller.**"

### ii.    Defendant's Answering Position

In construing claims, "the analytical focus must begin and remain centered on the language of the claims themselves[.]" *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001). Here, the context surrounding the term "detection device" is important in determining the proper approach for construction. This is true because, as the Federal Circuit has often stated, "[g]eneric terms such as . . . 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure[.]" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir 2015) (en banc) (internal quotes omitted); *see also TQ Delta, LLC v. 2Wire, Inc.,* 2018 WL 626472 at *11 (D. Del., Jan. 30, 2018) ("Here, "device" is a nonce word that does not connote any more structure than "module.") In this case, the relevant limitation recites "at least one ***detection device***, for detecting at least one external control signal and converting said at least one external control signal into at least one message carrying sensing signal." '503 Patent at 26:1-4, 36:21-24.

As recited in the claim, the required detection device performs not only a "detecting" function (i.e., "for detecting at least one external control signal") but also a "converting" function of "converting that signal into at least one message carrying sensing signal." The limitation fails, however, to recite specific structure as to ***how*** the ***detection device*** performs both functions or what structure performs them. The limitation is written in classic means-plus-function format although it omits the word "means" and replaces it with the nonce word "device." *Williamson,* 792 F.3d at 1350. Accordingly, the "detection device" limitation is governed by 35 U.S.C. § 112(f) (formerly, pre-AIA 35 U.S.C. § 112 ¶ 6). *See, e.g., Clinical Innovations, LLC v. Utah Medical Products,*

11

*Inc.,* 2007 WL 2688246 (D. Utah, Sept. 11, 2007) (finding the phrases "pressure detecting device" and "structure for detecting pressure" to "describe a function, not a definite structure" and thus subject to construction under § 112 as a means-plus-function term.)

The standard for determining application of § 112(f) "is whether the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. There is a rebuttable presumption that § 112(f) applies if the claim term includes the word "means"; if not, there is a rebuttable presumption that § 112(f) does not apply. *Id*. at 1348-49. Where, as here, the claim term does not use the word "means," the presumption can be overcome and § 112(f) will apply if the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." *Id*. at 1349. In other words, the analysis boils down to whether the term "detection device" conveys to a POSITA "sufficiently definite structure" to a POSITA. Despite knowing HeathCo's position that this term is governed by §112(f), Vaxcel makes no claim that "detection device" conveys sufficiently definite structure to a POSITA. Both standards are met here, and § 112(f) applies.

Vaxcel's proposed construction proves there is no "sufficiently definite structure" for the required "device." Its proposal includes a nearly infinite scope of devices (touch and touchless) with no limitation that it even perform a detecting function (let alone the converting function). Indeed, Vaxcel highlights the incredibly broad scope of devices when it states that a "detection device" is "one or more touch and/or touchless devices such as but not limited to" a list of sensors, switches, and buttons. Vaxcel's non-exclusive list includes touch devices, touchless devices, infrared sensors, electrostatic induction sensors, conduction-based sensors, simple pads and buttons, voltage dividers, and power interruption switches. Vaxcel's proposed construction for

12

detection *device* even includes "a conduction *rate* of a phase controller[.]" *Supra* at 10.  In other words, Vaxcel proposes that a *mere number* could be a detection *device*.  Vaxcel's proposed construction also erroneously includes devices that are not capable of performing the two functions required by the actual claim language.  For example, Vaxcel suggests that a simple "pad" and trivial "button" are devices that (1) detect at least one external control signal *and* (2) *convert* that signal into at least one message carrying sensing signal.  There is no disclosure in the '503 Patent of how a pad or button, without more, converts an external control signal into a message carrying signal.  For these reasons, Vaxcel's proposed construction should be rejected.

Not only does Vaxcel's proposed construction highlight the near infinite scope – and thus not sufficiently definite meaning – of the term detection device, the meaning of "device" provides no specific structure that would perform the recited functions.  For example, one dictionary defines "device" as "[COMPUT SCI] A general-purpose term used, often indiscriminately, to refer to a computer component or the computer itself. [ELECTR] An electronic element that cannot be divided without destroying its stated function; commonly applied to active elements such as transistors and transducers. [ENG] A mechanism, tool, or other piece of equipment designed for specific uses."  JA-000011.[2]  Further, the word "means" can be swapped for "device" without altering the substance of this limitation, because in neither case is a POSITA informed as to what structure will achieve the recited functions.  Thus, as used in the claims of the '503 Patent, "detection device" is an undefined and undescribed design for "detecting at least one external control signal and converting said at least one external control signal into at least one message

---

[2] *See also* JA-000018, "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function <an electronic ~>"; JA-000024, "1. A physical unit or mechanism which performs a specific function or serves for a particular purpose. A device may be electrical, mechanical, electromechanical, and so on, and examples include, resistors, cable connectors, transistors, ICs, disk drives, and computers. [ . . .]"

carrying sensing signal." This is not sufficient structure. *See, e.g., TQ Delta, LLC*, 2018 WL 626472 at *11-12 (finding no disclosure of sufficiently definite structure for "message determination module").

Because the "detection device" limitation is governed by § 112(f), the specification must disclose specific structure for that device corresponding to the claimed function or the claim is indefinite. *Williamson,* 792 F.3d at 1351. Here, however, the specification contains no such corresponding structure. Although the specification does describe certain detection devices (*see, e.g.,* '503 Patent at 25:24-48, added via a Preliminary Amendment, dated 9/13/17 (JA-000029-33)), it hopelessly conflates and confuses two constituent parts of the detection device limitation, namely the "external control signal" that is detected by the detection device and the "message carrying sensing signal" that is supposed to be generated by the detection device.[3] Thus there is no structure disclosed in the specification that ***corresponds*** to the two claimed functions, rendering it indefinite. *Williamson,* 792 F.3d at 1352 ("if the patentee fails to disclose adequate corresponding structure, the claim is indefinite.").

Even assuming, however, that the "external control signal" term is not indefinite and is given the construction proposed by Vaxcel, the detection device term is still indefinite. This is because claims that are in § 112(f) format require that "the patent specification [ ] disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc*., 753 F.3d 1375, 1378 (Fed. Cir. 2014). As discussed above, Vaxcel's "definition" of detection device includes an "absurdly overinclusive" scope that still fails to identify structure that can perform

---

[3] As discussed below, the "external control signal" term is also indefinite and, therefore, the detection device term is also indefinite.

both recited functions. *See Bell Northern Research, LLC v. CoolPad Tech, Inc.,* 2019 WL 3766688, at *6 (S.D. Cal. Aug. 9, 2019) ("The Court will not scour the Plaintiff's submission to locate, or otherwise ascertain from the blanket proffer made by Plaintiff what structure . . . is disclosed to provide the [claimed] function"). Vaxcel identifies structure that is not capable of performing the functions (pad, button) and also identifies a mere number (conduction rate) which, obviously, cannot perform *either* of the recited functions. This does not meet the requirement of structure that is capable of or "adequate" to perform the recited functions. *Williamson,* 792 F.3d at 1352.

### iii.    Plaintiff's Reply Position

HeathCo essentially sets forth three incorrect arguments against the term detection device: (1) the term is a *de facto* "means plus function" element, which requires disclosure of corresponding structure within the specification, (2) there is too much structure disclosed for a detection device and (3) within the disclosed structure there is no disclosure that links the structure to the recited functions. Each of these arguments is belied by the facts. "Detection device" is not subject to 35 U.S.C. § 112(f), and even if it were, the specification discloses structure which performs both detection of an external control signal and converting that signal into a message carrying sensing signal.

The most telling aspect of HeathCo's arguments is the lack of evidence for any of its assertions. The Federal Circuit, in *Williamson*, 792 F.3d at 1349, makes it abundantly clear that unless the word "means" is employed, a rebuttable presumption exists that the 35 U.S.C. § 112(f) does not apply and that presumption can only be overcome "if the challenger demonstrates" that the claim term fails to "recite sufficiently definite structure" or recites "function without reciting sufficient structure for performing that function." Rather than attempting to meet its burden, HeathCo instead improperly shifts the burden to Vaxcel ("Despite knowing HeathCo's position

15

that this term is governed by §112(f), Vaxcel makes no claim that 'detection device' conveys sufficiently definite structure to a POSITA."). *Supra* at 12. HeathCo's only alleged support is that the court in *Williamson* held that similar to the word module, the term "device" is a nonce word (this is not evidence), that Vaxcel's proposed construction, which is also not evidence, proves that there is not sufficiently definite structure and that a 1989 dictionary provides various definitions for the "device" which HeathCo asserts without support, proves that a POSITA would not be informed as to the structure of the detection device. Interestingly, one of the definitions that HeathCo cites is an engineering definition that states that a "device" is "a mechanism, tool, or other piece of equipment designed for specific uses." JA-000007-13. The term in question is "detection device", not simply device. Thus, by HeathCo's own admission, the detection device would be a mechanism tool or other piece of equipment designed for the specific use of detection. Additionally, "detection device" is a recognized term. For example, the FDA provides specific guidance on "Computer-Assisted Detection Devices." JA-000336-344. For at least the above reasons, HeathCo has not met its burden of proof and the term "detection device" is not subject to 35 U.S.C. § 112(f).

Even, *arguendo*, if the term "Detection Device" were subjected to 35 U.S.C. § 112(f), the specifications of the Suit Patents disclose sufficient structure corresponding to the claimed functions. As the Federal Circuit stated in *Williamson*, claim construction under 35 U.S.C. § 112(f) is a two-step process: identify the claimed function(s), then determine what structure disclosed in the specification corresponds to the claimed function(s). 792 F.3d at 1351-62. As for the first step, the parties agree that the recited functions include "detecting at least one external control signal" and "converting said at least one external control signal into at least one message carrying sensing signal." Regarding the second step, HeathCo does not dispute that the Suit Patents disclose

detection devices such as those disclosed at D.I. 64-2 Exhibit A, '503 Patent, Col. 25:21–24.

Instead, HeathCo incorrectly asserts, without support, that there are too many structures disclosed

and the disclosed structures cannot perform the required functions ("Vaxcel identifies structure

that is not capable of performing the functions (pad, button) and also identifies a mere number

(conduction rate) which, obviously, cannot perform either of the recited functions."[4] *Supra* at 15.

HeathCo's argument fails on various levels.

The specification of the '503 Patent discloses in detail how an infrared sensor may be

utilized as the detection device, explaining both the structure and how the structure is utilized to

perform both recited functions:

> The infrared ray sensor 11 **detects object motions** coming from the user and converts the detected result into message carrying low voltage sensing signals readable to the microcontroller 12…The infrared ray sensor 11 is an exemplary embodiment for a **detection device to detect the external motion signal played by the user and convert the external motion signal into a message carrying sensing signal**. Col. 7:41-54. (emphasis added)

> Still referring to FIG. 2, the infrared ray sensor 11 comprises a transmitting circuit and a receiving circuit. In the transmitting circuit, an infrared light-emitting diode IR_LED is connected to the drain of the transistor M1 in a serial fashion, and the gate of the transistor M1 is connected to an output of the timer 110. In practice, the timer 110 can be a 555 timer IC. The 555 timer IC generates a square-wave with a frequency of about 3 kHz to modulate the drain current of the transistor M1, such that the infrared light emitting diode IR_LED provides an infrared light signal with a square wave form which is severed as the light source of the infrared ray sensor.

> The receiving circuit is an infrared light detection circuit and comprises a photosensitive diode PD, two serially connected amplifiers 112, 114, and a transistor M2. The drain of the transistor M2 is connected to a pin pin_3 of the microcontroller 12. In practice, the amplifiers 112 and 114 can be LM324 operational amplifier. The combination of the amplifier 114 and resistors R7 through R10 is a Schmitt trigger circuit having a threshold voltage, and the threshold voltage is produced by the voltage divider

---

[4] Notably, Vaxcel's proposed construction recites "a conduction rate of a phase controller **set by a user"** (emphasis added) and not simply a conduction rate of a phase controller. HeathCo omits "set by a user" in its brief avoiding that the user setting the rate is the external control signal that HeathCo asserts is not disclosed.

composed by resistors RS and R9. The Schmitt trigger circuit makes possible a high discrimination of a true detection to a false one.

The photosensitive diode PD is used to receive the infrared light signal from the transmitting circuit. If the output voltage of the amplifier 112 exceeds the threshold voltage, the amplifier 114 produces a high voltage applied to the gate of the transistor M2, such that the transistor M2 is turned on. Therefore, the drain of the transistor M2 provides a low voltage sensing signal which is close to zero voltage, and the time length of the low voltage sensing signal is related to the time period the infrared ray is detected.

In addition, if the photosensitive diode PD does not receive the infrared light signal, the output voltage of the amplifier 112 is lower than the threshold voltage, and then the amplifier 114 provides a low voltage to the gate of the transistor M2, such that the transistor M2 is turned off. Therefore, the drain of the transistor M2 provides a high voltage of VDD. In other words, the pin pin_3 of the microcontroller 12 receives either a **low voltage sensing signal or a high voltage** depending on whether the infrared ray sensor 11 detects the infrared light or not, wherein the time length of the low voltage sensing signal is about the time period within which the infrared light is detected.

In other words, the infrared ray sensor 11 **generates a sensing signal** which is characterized by a low voltage within a time length. The sensing signal with a specific time length of low voltage can be considered as a sensing signal format which carries message to make the microcontroller 12 to operate… Col. 10:11-62. (emphasis added)

Referring to FIG. 2, FIG. 3A and FIG. 3B, FIG. 3A is a schematic diagram showing a practical operation of an infrared ray sensor associated with a microcontroller based electronic switch according to an exemplary embodiment of the present disclosure, and FIG. 3B is a waveform diagram showing a low voltage sensing signal according to an exemplary embodiment of the present disclosure….**When an object, here is a human hand, moves in front of the infrared light-emitting diode IR_LED, the infrared light emitted from the infrared light-emitting diode IR_LED scatters from the object surface onto the photo sensing surface of the photosensitive diode PD [detects the external control signal]**. Col. 11, ll. 8-21. (emphasis added)

After describing in detail how to use an infrared ray sensor to perform the recited function, the '503 Patent discloses that "[i]t is clear to see the advantage…to integrate various switch control functions in one without changing the hardware circuit design. All are simply done by defining the

18

format of sensing signals and by modifying the program written in the OTPROM memory in the microcontroller." Col. 14:34-39.

It would thus be clear to a POSITA how to employ other touch and/or touchless devices as the detection device. As with the infrared sensor, which detects when a user enters or leaves or causes something to enter or leave the detection zone (*i.e.,* detects the external control signal), the device would simply need to be designed to detect that a user operated/played the device (e.g. pushed a button, tapped/touched/swiped a pad/set a conduction rate of a phase controller, set the input or output voltage of a voltage divider…) and then used that information to generate a sensing signal having a format selected by the designer such that the sensing signal provides information to the controller that the controller is programmed to receive and interpret.

In light of the above, the Court should reject HeathCo's proposed claim construction and accept Vaxcel's proposed construction for the term "detection device."

### iv.    Defendant's Sur-Reply Position

HeathCo previously demonstrated that the claim terms fail to "recite sufficiently definite structure" as they set forth ***no*** structure for performing the two recited functions "detecting" and "converting." *Williamson*, 792 F.3d at 1349. The lack of structure in the claims is the precise evidence Vaxcel alleges HeathCo failed to provide and rebuts the presumption that the terms are not means-plus-function terms. Vaxcel's effort to turn HeathCo's dictionary definitions to its advantage further demonstrates the total lack of structure and overbreadth of Vaxcel's construction. Obviously, neither "mechanism," "tool," nor "other piece of equipment" provide "sufficiently definite structure". Moreover, even if these provide structure for "detecting," they

19

provide no such structure for the other required function – "converting" – and fails the *Williamson* test for that separate reason.[5]

Vaxcel's failed efforts to identify structure in the specification that is tied to ***both*** functions of the "detection device" is exemplified by its attempt to "explain" how a conduction rate can be a "detection device."  Vaxcel attempts to clarify that its proposed construction of detection device is not ***merely*** a conduction rate but it is "a conduction rate of a phase controller ***set by a user*[.]**" *Supra* at 17-18, n.4.  That does nothing to explain how a "conduction ***rate*** of a phase controller" – set by a user or otherwise – can detect an external control signal and convert it into a message carrying sensing signal.  This confusion, lack of clarity, and imprecision infects the entire disclosure of the '503 Patent with respect to any structure allegedly for the detecting and converting functions of this term.  Thus, it is indefinite.

b.  **"Message Carrying Sensing Signal"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Message Carrying Sensing Signal** '503 Patent, claims 1, 8, 11, 12, 16, 20, 26, 40, 41, 53, 56 | No construction is necessary.<br><br>However, if it is deemed that a construction is required then the construction should be:<br><br>One or more formatted signals interpretable by a processor, microcontroller or an ASIC (e.g., a signal having a voltage aspect and a timing aspect). | a signal having at least a first voltage with a first time length and a second voltage with a second time length |

---

[5] In arguing that sufficient structure is disclosed, Vaxcel argues "it would thus be clear to a POSITA how to employ other [ ] devices as the detection device . . . [it] would simply ***need to be designed*** to detect . . . and then used that information to generate. . . .a sensing signal . . . ***selected by the designer***[.]"  Thus, Vaxcel admits the '503 Patent lacks corresponding structure because a POSITA would have to ***design*** the device.  Reliance on what a POSITA would design does not satisfy the disclosure requirements of §112(f).  *See Williamson,* 792 F.3d at 1351 ("the fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed").

### i.      Plaintiff's Opening Position

The phrase "message carrying sensing signal" is also found in the '503 Patent claims. Claim 1 recites in relevant part:

> …a **microcontroller to receive and interpret said at least one message carrying sensing signal**…wherein said microcontroller controls a conduction state or a cutoff state of said first controllable switching element…according to said at least one message carrying sensing signal…**wherein said at least one message carrying sensing signal is characterized with a signal format**… (Emphasis Added)

The patentee merely used the term in its ordinary and customary way – as a formatted signal that carries a message related the signal sensed/detected by the detection device.  The specification of the '503 patent further supports this assertion.  The following is a non-exhaustive list of relevant citations to the '503 specification, D.I. 64-1 Exhibit A, Col. 2, ll. 54-58, Col. 2, ln. 64 – Col. 3, ln. 1, and Col. 3, ll. 54-62 disclose: "a circuitry responsively generates a message carrying sensing signal having a first voltage with a time length corresponding to the time interval the object entering and staying in [the]detecting zone."  According to D.I. 64-1 Exhibit A, Col. 3, ll. 6-12: "When the user contacts the direct touch interface (for example, presses the push button) for a time interval, a first voltage signal is detected by the microcontroller which is a message carrying sensing signal having the first voltage with a time length corresponding to the time interval the touch interface being contacted."  Further, it is disclosed at D.I. 64-1 Exhibit A, Col. 3, ll. 31-34, "The microcontroller…designed to read and interpret the message carrying sensing signal…"

The phrase "message carrying sensing signal" is not ambiguous and Vaxcel respectfully submits that the phrase should be afforded its ordinary and customary meaning.  If it is deemed that a different construction is required the phrase "**message carrying sensing signal**" should be

21

construed to mean "**One or more formatted signals interpretable by a processor, microcontroller or an ASIC (e.g., a signal having a voltage aspect and a timing aspect).**"

### ii. Defendant's Answering Position

The "message carrying sensing signal" is supposed to be generated by the detection device and is also received and interpreted by the claimed "microcontroller" (via the "third control pin"). '503 Patent, claim 1 at 26:1-7. Vaxcel's proposed construction adds no clarification to the already explicit words of the claim and, indeed, does not meaningfully limit the term. Under Vaxcel's proposal *any* signal—so long as it is somehow "formatted" (whatever that means)—is a message carrying sensing signal. The fact that it includes an example in the construction does nothing to cure the vagueness.

In contrast to Vaxcel's non-limiting construction, HeathCo's proposed construction properly limits "message carrying sensing signal" to the types of signals that can be said to carry messages. As described repeatedly in the specification, the message carrying sensing signal is a signal that has, at least, a first voltage for a first period of time followed by a second voltage for a second period of time. *See e.g.*, '503 Patent at 11:8-12:21; 14:40-67; 21:4-24 ("There are quite a few detection methods . . . that can be applied to *the present invention*[.] Each detection method may require different motion signals . . . *but the core technology remains* using the time length and format of the binary sensing signals as the message carrier") (emphasis added); 23:29-24:32. This description of "the present invention" and "the core technology" amounts to a disclaimer and disavowal of signals that do not comport with this format. *See, e.g., Luminara Worldwide, LLC v. Liown Elecs. Co., Ltd.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (noting cases finding disavowal or disclaimer based on statements such as "the present invention includes" or "the present invention is"). HeathCo's construction is true to the description of message carrying sensing signals being

binary (i.e., having a first voltage and a second voltage – namely, high and low) and timing aspects associated with each voltage to encode the message in the signal.

### iii.    Plaintiff's Reply Position

HeathCo's proposed construction and supporting analysis are contrary to the disclosure of the Suit Patents and must be rejected. Additionally, HeathCo's arguments are contrary to the law and must be rejected.

HeathCo agrees that in at least one disclosed embodiment, the message carrying sensing signal is binary ("HeathCo's construction is true to the description of message carrying sensing signals being binary…"). *Supra* at 22-23. However, HeathCo then proposes a construction that requires the signal to have both a high voltage and a low voltage aspect. This is in direct contrast to the disclosure in the '503 Patent of the embodiment that states the binary signal is either a 1 or a zero (not both):

> The program of the microcontroller 12 scans the voltage at the pin pin_3…If the voltage…is high (bit 1), the program of the microcontroller 12 stays in the loop…that the…switch 1 is off…if the voltage at the pin pin_3 is low (bit 0), the program of the microcontroller 12 jumps into the loop…in which the…switch 1 is on…when the…switch 1 is on, the program of the microcontroller 12 scans the voltage at the pin pin_3...If the voltage at the pin pin_3 of the microcontroller 12 is low (bit 0), the program of the microcontroller 12 jumps to step SS to compare the time length Ts with a preset time To. Col. 12, ll. 22-41.

In fact, even the citations to the specification that HeathCo relies upon as an alleged disavowal only disclose a single high or low voltage, not both. Thus, even though HeathCo's allegation of a disavowal by Vaxcel falls woefully short of the required "clear and unmistakable disclaimer" (*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) (internal citations omitted)), it is irrelevant because the specification discloses that the message carrying sensing signal may be a single high or a single low voltage. This is further emphasized by Fig. 3B which illustrates that only the low voltage signal has a time Ts compared to a preset time To.

23

Finally, HeathCo asserts that Vaxcel's proposed construction is vague because HeathCo does not know what the word format means.  However, as stated above regarding the detection device, the specification clearly states that the format of the message carrying sensing signal is a design choice:  "All are simply done by defining the format of sensing signals and by modifying the program written in the OTPROM memory in the microcontroller." D.I. 64-2 Exhibit A, '503 Patent, Col. 14:36-39.

In light of the above, the Court should accept Vaxcel's proposed construction for the term "message carrying sensing signal."

### iv.     Defendant's Sur-Reply Position

Vaxcel misconstrues HeathCo's construction as requiring the "message carrying sensing signal" to simultaneously be high and low.  It does not.  Indeed, Vaxcel's citation proves that the message carrying sensing signal ***must*** have a first voltage and a second voltage; the patent explicitly refers to high voltage (bit 1) and low voltage (bit 0) – i.e., a first voltage and a second voltage as proposed by HeathCo.  Vaxcel also asserts Fig. 3B "illustrates that only the low voltage signal has a time Ts compared to a preset time To." *Supra* at 23.  Vaxcel fails to mention that while the low voltage has a time aspect of Ts, the high voltage has a time aspect as well – that is, all other times: "***when*** the infrared ray sensor 11 detects an object [ ] purposefully entering the infrared ray detecting zone, the infrared ray sensor 11 generates a ***low voltage*** sensing signal, by contrast ***when*** an object is not within the infrared ray detecting zone, the infrared ray sensor 11 generates a ***high voltage***." '503 Patent at 11:35-41 (emphasis added).

24

c.    **"External Control Signal"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| V/H. **External Control Signal** '503 Patent, claims 1, 8, 17, 20, 40, 53 '902 claims 27, 29, 30 '292 claim 30 '691 Patent, claims 1, 7-10, 59, 65-68 '916 Patent, claims 1, 4 '367 Patent, claim 12 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: A signal that is generated and processed by the detection device. | Indefinite |

i.    **Plaintiff's Opening Position**

The phrase "external control signal" is in the '503, '902, '292, '691, '916 and '367 Patents. The '902, '292, '691 and '916 Patents all claim priority to the '392 Patent and the '367 Patent is a continuation-in-part of the '719 patent, which is a continuation-in-part to the '392 Patent.

Except for claims 9 and 67 of the '691 Patent, the claims from the identified patents recite a variation of the following: the detection device generates the external control signal, the microcontroller receives the external control signal and the controller responds to receipt of the external control signal. Claim 9 and 67 of the '691 Patent recite "wherein the first external control device includes a voltage divider…configured to output at least one voltage signal with a voltage value, wherein the at least one voltage signal with a voltage value is the at least one first external control signal." External Control Signal is described in the specification of the '503 patent as follows:

> The touch less interface may be implemented by a wireless method to receive wireless external control signal and convert the wireless external control signal into the message carrying sensing signal readable and interpretable to the microcontroller. The wire-less external control signal can be transformed from a motion signal generated with an infrared ray motion sensor, or it can be an electromagnetic wireless signal generated

25

> with a wireless receiver or transceiver, or it can be trans-formed from a voice signal generated with an A.I. (artificial intelligence) based device. The direct touch interface…uses a wired method to receive the external control signal set by an user, wherein the external control signal can be generated from a push button, a touch pad, a voltage divider, or a power interruption switch or button operated by the user, or a conduction rate of a phase controller set by the user, wherein, if the external control signal is an analogue signal, a conversion circuitry may be included in the detection device or as a virtual circuitry programmable embedded in the microcontroller to convert the analogue signal into the message carrying sensing signal readable and interpretable to the microcontroller. (D.I. 64-1 Exhibit A, Col. 25, ll. 23 – 48).

The '292, '691 and '916 specifications provide similar disclosures (D.I. 64-1 Exhibit F, Col. 6, ll. 50 – 62, D.I. 64-1 Exhibit G, Col. 6, ln. 54 – Col. 7, ln. 3, D.I. 64-1 Exhibit H, Col. 6, ln. 58 – Col. 7, ln. 3.

The phrase "external control signal" is not ambiguous and Vaxcel respectfully submits that it should be afforded its **ordinary and customary meaning** or if it is deemed that a different construction is required the phrase "**external control signal**" should be construed to mean "**a signal that is generated and processed by the detection device**."

### ii.    Defendant's Answering Position

"External control signal" is indefinite because a POSITA would not understand which of two possibilities it refers to: a signal performed by a user (such as a hand waving in front of a sensor or pushing a button), or an electronic signal created as a result of that performance. The disclosures are at best inconsistent and at worst nonsensical. Because "external control signal" in view of the claims and specification "might mean several different things and no informed and confident choice is available among the contending definitions," it is indefinite. *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 at 911 n.8 (2014)); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (same).

26

Beginning with the claims, this confusion is apparent, both within the same patents and among the different patents.  Some claims appear to support the construction that the external control signal is the action of a user.  For instance, some claim "an external control signal played by a user."  *See, e.g.,* '902 Patent, cls. 8-9, 12-14, 21-22, 25-27, 30-32; '292 Patent, cls. 7-8, 10-12, 21-22, 24-26, 30-32.[6]  Others claim a "detection device" such as a "direct touch interface" like a "push button" or a "touch less interface" to "detect[]" or "receive and convert" the "external control signal" into a "message carrying sensing signal."  *See, e.g.,* '503 Patent, cls. 8-11, 18-20, 31, 35-37, 53-56, 65-68, 75-79, 89-91, 101-110.  Yet, in other claims, including in these very same patents, the "external control signal" is also an electronic signal.  For example, the "external control signal" is somehow both a "voltage output of the voltage divider set by a user" ('292 Patent, cls. 50, 64, 76) and is "played by a user" (*id.*, cls. 7-8, 10-12, 21-22, 24-26, 30-32).  But the selfsame patent also indicates that the "value of a voltage divider set by the user" cannot be the "external control signal" as they are explicitly different things.  *See, e.g., id.*, cls. 7-8, 21-22 ("…according to an external control signal played by a user *or* according to a value of a voltage divider set by the user.").  Yet other patents claim "an external control unit…outputting at least one first external control signal."  *See, e.g.,* '691 Patent, cl. 1; '916 Patent, cl. 1.

The written descriptions add to this confusion.  Notably, outside of the claims, there is little discussion in any specification regarding the claimed "external control signal."  What little there is confusingly supports ***both*** of the definitions.

For instance, the '503 Patent discloses that "[t]he detection device is for detecting an external ***motion*** signal played by a user and converting said external motion signal into a message carrying sensing signal."  '503 Patent at 2:28-31, 3:29-31 (emphasis added); *see also id.* at 7:51-

---

[6] As discussed below, the specifications show that this means a user's movement.

54. This is parallel to the claim language "at least one detection device, for detecting at least one external control signal and converting said at least one external control signal into at least one message carrying sensing signal." *Id.* at cls. 1, 40, 57. This disclosure also explains what the claim language "external control signal played by a user" refers to (*see* '902 Patent, cls. 27, 30; '292 Patent, cl. 30) – i.e., a "motion" of the user such as pushing a button or waving a hand in front of a sensor,[7] where the ordinary meaning of "played" in this context is "performed" or "engaged in."[8]

The only remaining relevant disclosures (in the '292, '691, and '916 Patents) are scant and only add to this confusion. These disclose a "time setting unit" which "is a type of external control unit[] designed to detect various external control signals and to convert the various external control signals into various message signals…. The external control units may be configured with a push button, a touch sensor, a voltage divider, a power interruption detection circuitry or a wireless control receiver for generating message signals…." '292 Patent at 6:51-62, '691 Patent at 6:58-7:3, '916 Patent at 6:58-7:3. Thus, the "external control signal" might be, for instance, the push of a button or the touch of a sensor, or it might be a voltage signal.

Vaxcel ignores most of this disclosure, focusing solely on one particular section at the very end of the '503 Patent (added to the specification via a Preliminary Amendment (JA-000029-33)), the "summary of the present disclosure." *Supra* at 25-26. But even this summary is not clear as to which, if any, interpretation it supports. For instance, it states that "[a] detection device serves

---

[7] *See also id.* at 21:15-16 ("[e]ach detection method may require different motion signals to be played by the user"), 22:52-53 ("[t]he three basic working modes can be easily managed with simple motions played by the user," referring the hand swiping motion shown in Fig. 10B), 23:24-28 ("detection zone for a[] user to play motion signals for performing" various functions, referring to Fig. 10D), 24:6-9 (referring to "playing motion signal" referring to Figs. 11A-D).
[8] *See, e.g.,* JA-000036-37 (tr. defns 23, 27, 38), JA-000050-51 (verb (tr.) defns 1-4).

as an interface between human and the electronic switch to convert the external control signal into the message carrying sensing signal" where the "detection device [] may be configured as touch less interface and direct touch interface." '503 Patent at 25:21-26. This could equally refer to the detection of motion by a user (supported by the written description disclosure discussed above), or to a signal created as a result of that motion (supported by, for example, claims 19-20, which state the "external control signal is a voltage signal").

If Vaxcel's construction were correct, it would render the "played by the user" claims nonsensical, and therefore indefinite, as a user cannot "play" (perform) "a signal that is generated and processed by the detection device." *See, e.g., Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*, 839 Fed. App'x 500, 502-5 (Fed. Cir. 2021) (nonprecedential) (finding claim with term "the AM and PM unit dose forms target," where ordinary meaning of "target" was "set as a goal," indefinite as nonsensical because "reading the claim literally, a dose form, which is an inanimate object, cannot set a goal"). Vaxcel's construction further demonstrates the indefiniteness of the claim term. It requires that the "external control signal" is "***generated and processed*** by the detection device." How can the "detection device" "detect," "receive," and "convert" the "external control signal" (as it must according to the plain language of the claims), yet "generate" the same signal it detected and received, and somehow also "process" the signal that it just generated? Further, Vaxcel's construction is itself indefinite, as it refers to "the detection device," but only the '503 Patent claims such a device, thereby lacking an antecedent basis and further supporting a finding of indefiniteness. *See, e.g., HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 692 (Fed. Cir. 2019) (affirming ruling of indefiniteness because patent owner's proposed construction referred to a second indefinite term).

29

### iii.     Plaintiff's Reply Position

HeathCo provides no proposed construction for this term as, according to HeathCo, this term is "indefinite because a POSITA would not understand which of two possibilities it refers to: a signal performed by a user (such as a hand waving in front of a sensor or pushing a button), or an electronic signal created as a result of that performance." *Supra* at 26.  As illustrated above regarding the detection device, the claims of the '503 Patent recite a detection device that detects an external control signal and according to the specification that external control signal is the detection that the user is playing/operating[9] the detection device (e.g., the act of pushing a button or entering a detection zone).  HeathCo does not dispute this.  In the remaining patents, the definition of external control signal in the asserted claims is consistent with that of the '503 Patent. While HeathCo asserts that the value of the voltage divider "set by the user" is somehow an inexplicable anomaly and cannot be an external control signal because the claim calls for the external control signal to be played "or" the value of the voltage divider to be set, this ignores the facts.  Some of the claims are written this way to highlight the fact that the value of the voltage divider is set as opposed to a button or a sensor that can be played/operated.

Finally, HeathCo asserts that Vaxcel's proposed construction demonstrates that this term is indefinite because a detection device cannot detect, receive and convert the external control signal, and the since the term detection device is only used in the '503 Patent the construction lacks antecedent basis.  These arguments are simply unfounded.  Vaxcel cited to the language in the '503 Patent which clearly describes how the detection device performs these functions and there is no requirement that a proposed definition of a claim term include antecedent basis.  The claim term has proper antecedent basis. *HZNP Meds. LLC v. Actavis Labs. UT, Inc.* is factually irrelevant

---

[9] (JA-000036-37 at 2-2, defns 14, 29).

as that case included an indefinite term in the proposed construction.  Vaxcel has already pointed out the structure and function of a detection device.

In light of the above, the Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction for the term "External Control Signal."

### iv.    Defendant's Sur-Reply Position

Vaxcel's befuddling statement that the "external control signal is the detection that the user is playing/operating the detection device (e.g., the act of pushing a button or entering a detection zone)," *supra* at 30, shows that "external control signal" is indefinite.  Is it the ***result*** of this "detection," is it the ***action*** that is detected by the "detection device", or is it the ***act of detecting*** the action?  If it is the result of a detection by the "detection device" (a signal within the security light), what is it "external" to?  Vaxcel's description is impossible to parse because the claim term is impossible to construe.

Instead of addressing the differences in the use of this claim term both among and within the patents, Vaxcel makes the unsupported assertion that "the definition of the external control signal in the asserted claims is consistent with that of the '503 Patent."  *Supra* at 30.  Yet, Vaxcel does not explain the discrepancy between its construction and, for example, the claims of the '902 and '292 Patents, which claim "an external control signal played by a user."  Substituting Vaxcel's construction (underlined), this limitation reads (inconsistently): "<u>a signal that is generated and processed by the detection device</u> played by a user."  Vaxcel appears to argue there is no conflict because the detection device is "played by a user."  *See supra* at 30.  Such a tortured interpretation changes what is claimed (from a signal that is played by the user) to a signal generated by a device that is played by the user.

Vaxcel also ignores basic principles of claim interpretation.  It argues that the claim language "according to an external control signal played by a user ***or*** according to a value of a

31

voltage divider set by the user" does not show that the "value of a voltage divider" cannot also be the "external control signal" because "[s]ome of the claims are written this way to highlight the fact that the value of the voltage divider is set as opposed to a button or a sensor that can be played/operated." *Supra* at 30.  Vaxcel not only fails to explain what it means to "set" the value of a voltage divider (is it not by pushing a button or the like?) but also cites nothing to support its proposition and ignores that the plain language of the claim requires the "external control signal" and "value of a voltage divider" to be different things.

      **d.**      **"Loading And Power Control Unit"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- | --- |
| H. **Loading and Power Control Unit** '947 Patent, claims 20, 21 '902 Patent, claims 15, 16, 17 '032 Patent, claim 1 '292 Patent, claims 15, 16, 17, 79, '362 Patent, claims 1, 2 '719 Patent, claims 1, 5 '564 Patent, claim 9 '367 Patent, claim 12 '691 Patent, claims 1, 59 '916 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: A circuit that includes at least a controller in electrical communication with switching circuitry | a control unit that both controls the switches and controls the average current through the load |

      **i.**      **Plaintiff's Opening Position**

The phrase "loading and power control unit" is found in every patent except the '503 Patent.  As stated above, these patents are related and the disclosures regarding the elements in question are consistent across the various patents.  Additionally, the claim language states that the loading and power control unit is a circuit that includes at a minimum a controller and a switching circuitry.  The claim language of the '947, '032, '292, '564, 367, '691 and '916 Patents specifically recite: "the loading and power control unit comprises a controller and a switching circuitry".  The claim language of the '902 and '292 Patents recite: "loading and power control unit includes a microcontroller electrically coupled to the light sensing unit, the motion sensing unit and at least

two switching devices…" and the '362 and '719 Patents recite: "the loading and power control unit comprises a microcontroller electrically coupled with a (controllable '719 Patent) semiconductor switching device."

It is clear from the claim language that the loading and power control unit is a circuit that includes a controller electrically coupled to switching circuitry. Regardless of whether the claim language further provides insight into a functionality of this circuit, the element is defined by specific structure and the language from the specification does not contradict this language.

In view of the foregoing, the phrase "loading and power control unit", is not vague and Vaxcel respectfully submits that it should be afforded its **ordinary and customary meaning** or if it is deemed that a different construction is required the phrase "**loading and power control unit**" should be construed to mean "a **circuit that includes at least a controller in electrical communication with switching circuitry**."

### ii.    Defendant's Answering Position

HeathCo's construction gives meaning to this claim term while Vaxcel simply repeats the extant claim language regarding what the "loading and power control unit" ("LPCU") "comprises." "Ideally, claim constructions give meaning to all of a claim's terms." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016). A construction that merely "include[s] features of that term already recited in the claims would make those expressly recited features redundant." *Id.* Vaxcel's construction is redundant as it includes only extant claim language, while HeathCo gives meaning to this term beyond what is expressly recited. There are two parts to HeathCo's construction: 1) the meaning of "loading and power control," and 2) the understanding of what the references to multiple "units" in the claims convey to a POSITA about the claimed circuit design (namely, that they are independent, non-overlapping units, with each

unit coupled to the controller in the LPCU).  HeathCo's construction is informed by the claims and specification.

**"Loading and power control":** A POSITA would understand that this refers to a control unit that controls both the switches and the average current through the load.  HeathCo begins with the plain meaning of the claims.  The "load" is the LEDs.  *See, e.g.,* '947 Patent (all indep. cls. claim an "LED load" and no other "load").  The plain meaning suggests that the LPCU controls the load.  The claims themselves clarify how.  The LPCU "comprises a controller and switching circuitry" where the controller "controls the switching circuitry," which includes at least one "switching device" (e.g., a transistor) is coupled to the light-emitting unit (LEDs).  *See, e.g.,* '947 Patent, cls. 1, 11, 20, 31, 48, 51, 53, 55 (i.e., all independent claims).  It follows that the LPCU controls the switches.  The "power" that is controlled by the LPCU is done via control of "the average electric current delivered to the LED load."  *Id.*  The LPCU thus controls the average current through the load.  There cannot be some other intervening component that ultimately provides the control; the control must come ***directly*** from the LPCU.

The specifications confirm this understanding.  Each embodiment depicts the controller in the LPCU as the only component with direct input to the switching circuitry with no intervening components.  *See, e.g.,* '947 Patent, Figs. 1A-C, 2A, 3A-B, 4A, 5-7.  No alternatives are disclosed.  A POSITA would understand that the controller, and therefore the LPCU, controls the switches.  Further, the specification exclusively discloses the controller, and therefore the LPCU, directly controlling the average current through the load, i.e., the light-emitting unit.  The specifications disclose that the LPCU "control[s] an average electric current delivered to the light emitting unit" to control the level of illumination.  *See, e.g.,* '947 Patent at 5:67-6:4; *see also id.* at 6:8-26.  The specifications also disclose that the LPCU controls the average power of the light emitting unit

(*see, e.g., id.* at 2:43-46, 3:15-17) which is another way of stating that it controls the average current, since LEDs are current-driven devices while the voltage across the LED is approximately constant. *See, e.g.,* JA-000060-66. A POSITA would understand the LPCU controls the average current through the LEDs.

**"Unit":** There are a number of "units" in the claims: "power supply unit," "light-emitting unit," "light sensing control unit," "motion sensing unit," "time setting unit," and the LPCU itself. A "unit" in this context is a self-contained, independent apparatus that performs a particular function and is part of a more complex whole. *See, e.g.,* JA-000072-73 ("a major building block for a set or system, consisting of a combination of basic parts, subassemblies, and assemblies packaged together as a *physically independent* entity"); JA-000013 ("[a]n assembly or device capable of *independent operation* … that performs some inclusive operation or function."); JA-000027 ("1. An item, group, structure, or entity which is regarded as a single entity or whole. 2. A unit (1) which is part of a larger item, group, structure, or entity. For example, a control unit, a data unit, a logic unit, or a crystal unit"). As this is a common engineering term (e.g., "central processing unit," "control unit," "gearbox and transmission unit"), a POSITA would understand this usage, and would understand that each unit is separate from each other unit; i.e., the claimed "units" cannot have overlap (or be merged into a single unit). Additionally, each embodiment in the specifications contain only separate units with no overlapping components. *See, e.g.,* '947 Patent at Figs. 1, 1A-C, 2A, 3A-B, 4A, 5-7, 1:57-3:29, 4:65-13:29. Nothing in the specifications or plain English indicates otherwise.

In addition, the claims and specification require each unit (apart from the LPCU) to be coupled to the controller in the LPCU. The controller is electrically coupled with the switching circuitry, which is electrically coupled with the power supply unit and light emitting unit. The

35

specifications set forth the remaining couplings.  They disclose that the "light sensing control unit" is "coupled to the [LPCU]," (*see, e.g.,* '947 Patent at 5:7-10), the "motion sensing unit" is "coupled to the [LPCU]," (*id.*, 5:11-13), and the "microcontroller [] is coupled to a time setting unit" (*id.*, 6:39-40).  Each embodiment shows that these units are directly coupled to the microcontroller and not any other component within the LPCU.  *See, e.g., id.* at Figs. 1A-B, 2A, 3A-B, 4A, 5-7.  A POSITA would understand the each "unit" apart from the LPCU itself is directly coupled to the controller in the LPCU.

### iii.    Plaintiff's Reply Position

HeathCo seeks to limit the scope of the asserted claims by its wholesale importing of limitations into the disputed claim term. "Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the specification into the claims…." *See, e.g.*, *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 561 (Fed. Cir. 2020) (internal citations omitted).  In this case, the plain language of the claims would be understandable to a POSITA without relying on extrinsic evidence.

The phrase loading and power control unit ("LPCU") is found in every patent except the '503 Patent.  The plain claim language states that the loading and power control unit is a circuit that includes at a minimum a controller and a switching circuitry.  The claim language of the '947, '032, '292, '564, 367, '691 and '916 Patents specifically recite: "the loading and power control unit comprises a controller and a switching circuitry."  The claim language of the '902 and '292 Patents recite: "loading and power control unit includes a microcontroller electrically coupled to the light sensing unit, the motion sensing unit and at least two switching devices including a first switching device and a second switching device" and the '362 Patent recites: "the loading and power control unit comprises a microcontroller electrically coupled with a semiconductor switching device."  Various claims further indicate that the LPCU controls the switches or the

36

LED load or turns on or off the LED loads. HeathCo's proposed construction would render these additional claim terms superfluous as every claim would require the LPCU to control both the switches and the LEDs. The claim language without more is sufficient to provide a POSITA with substantial guidance as to the meaning of the term LPCU.

Regardless of the clear description in the claims themselves for the LPCU, which HeathCo does not dispute, HeathCo would have the Court add multiple affirmative limitations (e.g., LPCU must control both the switches and the average current through the load regardless of claim language identified above to the contrary) and negative limitations both from the specification and from extrinsic evidence (e.g., requiring that the LPCU be entirely separate and distinct from every other unit and "there cannot be some other intervening component that ultimately provides the control; the control must come *directly* from the LPCU." *Supra* at 34 (emphasis in original)).

In light of the above, the Court should reject HeathCo's proposed construction and accept Vaxcel's proposed construction for the term "loading and power control unit."

### iv. Defendant's Sur-Reply Position

Vaxcel does not explain why its construction should be excused from the principle that claim constructions ideally give meaning to every claim term and that a construction that merely includes already recited features would be redundant and therefore inadequate. *Apple, Inc.*, 842 F.3d at 1237; *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018); *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008). Vaxcel's construction simply and unhelpfully parrots the recited features.

Vaxcel claims that HeathCo's construction would render "additional claim terms" in "[v]arious claims" (none of which are identified) "superfluous as every claim would require the LPCU to control both the switches and the LEDs." Vaxcel is incorrect. Controlling the LEDs is not the same as controlling the *average current* through the LEDs.

37

e.   **"A Voltage V Across Each LED Complies with an Operating Constraint of $V_{th}<V<V_{max}$ Featuring Electrical Characteristics of the LED"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **A Voltage V Across Each LED Complies with an Operating Constraint of $V_{th}<V<V_{max}$ Featuring Electrical Characteristics of the LED** '916 Patent, claim 1 '032 Patent, claim 2 '292 Patent, claim 1, 79 '691 Patent, claim 1, 59 '902 Patent, claim 23 '947 Patent, claims 20 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: When an LED is operating, it operates within a voltage range between a minimum threshold voltage required to trigger an LED to start emitting light and a maximum voltage across an LED to avoid damaging the LED that allows each LED to operate adequately and safely. | A voltage V across each LED in the LED load does not fall below Vth and does not exceed Vmax during operation Vmax and Vth are indefinite |

i.   **Plaintiff's Opening Position**

The meaning of the above phrase, which is found in the '916, '032, '292, '691, '902 and '947 Patents is clear from the claim language and need not be construed. The plain claim language, when read with the remaining language of the claim, literally sets forth the meaning of this phrase (while slight variations exist among the claims, such as first load/second load vs light-emitting unit, the relevant language is the same):

> an electric current passing through each LED of the first LED load and each
> LED of the second LED load remains at an adequate level such that a
> voltage V across each LED complies with an operating constraint of $V_{th}<V$
> $<V_{max}$ featuring electrical characteristics of a LED, where $V_{th}$ is a threshold
> voltage required to trigger the LED to start emitting light and $V_{max}$ is a

maximum operating voltage across the LED to avoid a thermal damage or burning out of LED construction.

As is apparent from the plain claim language, V is defined as the voltage across an LED, $V_{th}$ is defined as the threshold voltage for a LED to begin emitting light and $V_{max}$ is the maximum operating voltage before the LED may begin to experience thermal damage or begins to burn out. The specification does not conflict with the plain claim language and Fig. 9 in each patent discloses data sheets from various LED manufacturers showing this information. Thus, the meaning of this phrase is apparent from the plain claim language.

Vaxcel respectfully submits that this phrase should be afforded its **ordinary and customary meaning** or if it is deemed that a different construction is required the phrase should be construed to mean "**When an LED is operating, it operates within a voltage range between a minimum threshold voltage required to trigger an LED to start emitting light and a maximum voltage across an LED to avoid damaging the LED that allows each LED to operate adequately and safely**."

### ii.      Defendant's Answering Position

This limitation is indefinite because the meaning of "Vth" and "Vmax" as used in the claims are contrary to the patentee's own purported support for these values, i.e., values identified in LED manufacturer datasheets; the patentee's use of these terms is thus hopelessly internally inconsistent. *See, e.g., Competitive Techs., Inc. v. Fujitsu Ltd.*, 185 Fed. App'x 958, 965-66 (Fed. Cir. 2006) (holding that because one claim term required a certain structure but another excluded it, "a [POSITA] would be unable to determine the scope of the claims" because "they are internally inconsistent"); *see also* MPEP § 2173.03 ("A claim, although clear on its face, may also be indefinite when a conflict or inconsistency between the claimed subject matter and the specification disclosure renders the scope of the claim uncertain….").

The parties agree that the claim requires the operating voltage not fall below Vth and not exceed Vmax. However, the patents' discussion of these values is contrary to the claims, i.e., that Vth means the minimum voltage "required to trigger an LED to start emitting light" and that Vmax is the "maximum voltage across an LED to avoid damaging the LED." The sources cited as examples of Vth and Vmax do not support these definitions and a POSITA would be confused beyond the point of reasonable certainty.

The patent sets forth examples of "Vth" and "Vmax" based on ranges of "forward voltages" from certain LED manufacturers (discussed below). Forward voltage is simply the voltage dropped across the LED when it is on. *See, e.g.,* JA-000075-78 ("The $V_F$ is the voltage used up by the LED, or dropped, when current is traveling in the appropriate direction, forward."). The forward voltage is a fixed, material property of the LED that also depends on the current through (not voltage across) the LED. *See, e.g.,* JA-000080-92 ("[LEDs] are current-dependent devices with its forward voltage drop $V_F$, depending on the semiconductor compound (its light colour) and on the forward biased LED current").

Each patent sets forth its source for its sample values of Vth ("$V_F$ Min.") and Vmax ("$V_F$ Max.") in Fig. 9. *See, e.g.,* '947 Patent at 13:30-14:2. For instance, it gives values of 2.9V and 3.3V, respectively, for the Cree LED, and 2.7V and 3.3V, respectively, for the Lumileds LED. *See, e.g.,* '947 Patent, Fig. 9. ***But these values are not "Vth" and "Vmax."*** The patentee appears to have mistakenly derived these values from the "Forward Voltage Bin" sections of each datasheet. *See, e.g.,* JA-000105; JA-000155. "Bins" set different ranges for certain parameters (such as forward voltage) in the same LED family ("Series" in Cree, "Line" in Lumileds), which exist because there is variance inherent in the manufacture of LEDs. *See, e.g.,* JA-000162-64; JA-000166-68.

There are several problems with the usage of these values for "Vth" and "Vmax" that render those terms indefinite. *First*, the patentee merely chose the lowest minimum and highest maximum for each LED family *as a whole* as its example Vth and Vmax values. No one LED in these families has the purported Vth and Vmax because the minimum and maximum forward voltages are *per bin*. A POSITA has no way of resolving this discrepancy. *Second*, these values are not Vth and Vmax according to the patent. Rather, the minimum and maximum forward voltages in these datasheets are the range of voltages *per bin* at which the manufacturer expects the LEDs to emit *sufficient* light. The "minimum forward voltage" is not the voltage at which the LEDs *start* to emit light, nor is the "maximum forward voltage" the "maximum voltage across an LED to avoid damaging the LED." In fact, the maximum forward voltage has nothing to do with avoiding damage to any LED.

The incorrect usage of Vth is clear from the patent itself, which states that "as the forward voltage exceeds *2.5 volts* the LED chip is activated to generate a current flow *to emit light*." '947 Patent at 13:36-38 (emphasis added). Thus, the patent contradicts its assertion from Fig. 9 that this voltage begins at 2.7 V at a minimum. Because the amount of light emitted increases as current increases, the manufacturer identifies a minimum voltage at which it expects the LED to emit *sufficient* light, not merely turn on. Indeed, LEDs have two "threshold voltages" – their "turn-on" voltage when they start conducting (which is what the claim purports) and a second threshold where the current is high enough to achieve sufficient light output (what the datasheets report). *See, e.g.,* JA-000170-173 (discussing "Forward-Voltage 'Thresholds'"). This is confirmed by Figs. 8A and 8B, which were derived from the datasheets, and show substantial current flowing at voltages lower than 2.9V (Cree) or 2.7 V (Lumileds). This would further point a POSITA in conflicting directions.

41

Importantly, "Vmax" as used in the patents bears no resemblance to the "maximum forward voltage" in the datasheets. To secure allowance, the patentee argued during prosecution that the presence of such a "maximum" in the claims was not merely inherent to the LEDs but important to know operationally to avoid damaging the LEDs. *See* JA-000177-183, 211-13. The examiner apparently allowed the claims because of this argument. *See* JA-000252-57. The patents describe this "maximum" as "around 3.3 volts" at which the current "generates a heat that could start damaging the PN junction of the LED chip." *See, e.g.,* '947 Patent at 13:40-43. But the identified "$V_F$ Max." voltages indicate nothing of the sort. These are simply the maximum voltages per bin within expected tolerances at which sufficient light will be emitted. This is clear from the datasheets themselves. Each have plots of forward voltage vs. forward current (JA-000100; JA-000135-36) which show voltage values that exceed most bins' "maximum forward voltage" with no indication or warning of any damage whatsoever. *Compare* (JA-000105; JA-000155) (forward voltage ranges per bin) *with* (JA-000100; JA-000135-36) (voltage vs. current plots). Nor is there any indication in the datasheets of such a "Vmax." It cannot be the case the identified "maximum" forward voltages are the maximum voltages to avoid damaging the LEDs.

A POSITA would not have reasonable certainty about the meaning of these terms because the datasheets directly contradict the patent's usage. Thus, a POSITA not only has no guidance, but contradictory information, regarding how to determine the actual values of "Vth" and "Vmax," if any exist at all. This is particularly egregious regarding "Vmax," for which the datasheets give no indication, providing a POSITA with no guidance as to how to determine this value. This internal irresolvable inconsistency renders these terms indefinite.

### iii.    Plaintiff's Reply Position

HeathCo's assertion that this claim term is indefinite relies on the tortured explanation that the Patent employs data sheets from different LED manufacturers as exemplary of where to find

the threshold values defined in the specification and then because those data sheets employ industry standard rather than scholastic terminology, a POSITA would be "confused beyond the point of reasonable certainty." This position is belied by HeathCo's own exhibits.

HeathCo begins by stating that forward voltage, which is the voltage drop across the LED when it is on, depends on the current through ("not voltage across") the LED. *Supra* at 40-42. This statement is contradicted by HeathCo's Exhibit 15 (JA-000169-73): "When you apply a voltage across the two terminals of a diode, with the higher voltage on the anode side and the lower voltage on the cathode side, forward current (i.e., current from anode to cathode) will flow." JA-000170.

The remainder of HeathCo's arguments, that $V_{th}$ is not actually the voltage at which the LEDs start to emit light and the bald statement that $V_{max}$ "has nothing to do with avoiding damage to any LED" (*supra* at 41) are equally unpersuasive.

Regarding $V_{th}$, HeathCo asserts (1) that the diode begins to conduct small amounts of current prior to $V_{th}$ and thus, the $V_{th}$ provided in the data sheets is the start of the LED emitting "sufficient light" rather than just light. However, as evidenced by HeathCo's own Ex. 15 (JA-000169-73), this statement is contrary to how a POSITA would understand $V_{th}$:



"the exponential nature of a diode's I–V characteristic leads to voltage values that are quite similar to thresholds in the context of practical engineering work. Thus, it is often convenient to discuss the two voltages called out in the diagram [0.5V and 0.7V] as though they are thresholds." JA-000171. This also explains why in the specification, when generalizing $V_{th}$ across the four I-V

43

charts illustrated in Figs. 8A-8D, the specification states "as can be seen from the chart when a forward voltage V is below a minimum forward voltage at *around* 2.5 volts, the LED chip is not conducted so the current I is zero, as the forward voltage exceeds 2.5 volts the LED chip is activated to generate a current flow to emit light, as the forward voltage continues to increase, the current I increases exponentially at a much faster pace, at a maximum forward voltage *around* 3.3 volts the current I becomes 250 mA which generates a heat that *could* start damaging the PN junction of the LED chip." *See, e.g.*, '947 Patent at Col. 13:33-43.

Finally, HeathCo asserts that the patentee in Figure 9, improperly selected the lowest $V_{th}$ and the highest $V_{max}$ from the group of bins listed in the identified data sheets and as a result, a POSITA would have no way of resolving the discrepancy between an individual LED and the group. This is incorrect on multiple levels. The most obvious error is a POSITA would be able to employ the URL listed in Figure 9 and access the actual data sheet just as HeathCo did. The POSITA would then be able to read, understand and use the data sheet. As illustrated by another exhibit supporting HeathCo's Answering Brief, the POSITA would actually understand to select the lowest $V_{th}$ and the highest $V_{max}$ across the various bins as LEDs are not typically utilized as single LEDs but rather in series and thus the POSITA would need to take into account the specifications across the range of LEDS when selecting resistors and a voltage/current source. The reason the POSITA would need to know the range of specifications is because "Purchasing by the single bin, **assuming the supplier even offers it**, involves a price jump of as much as two orders of magnitude. **The more common, and economical, approach is to buy products that group multiple bins together**." JA-000167 (emphasis added).

Regarding HeathCo's conclusory assertion that $V_{max}$ is unrelated to avoiding damage to any LED, this is contradicted by the language of the specification cited above and by the data

44

sheets which state: "[t]he maximum forward current is determined by the thermal resistance between the LED junction and ambient" (JA-000097); and "Proper current derating must be observed to maintain the junction temperature below the maximum allowable junction temperature." JA-000129-30. If the thermal resistance from a solder point to ambient becomes too great the lamp life and optical characteristics start to deteriorate, which is why $V_{max}$ is specified.

In light of the above, the Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv.    Defendant's Sur-Reply Position

Vaxcel mischaracterizes HeathCo's positions and misunderstands HeathCo's exhibits.[10] First, Vaxcel misunderstands HeathCo's explanation of forward voltage. Vaxcel cites a portion of Ex. 15 (JA-000170-73) that simply states that when there is a voltage applied across an LED, a current will eventually flow and explains that "forward voltage" is the voltage the LED drops when an external voltage is applied, but there is a maximum forward voltage (which is a material property of the LED). This is shown by the graph in Ex. 15 (JA-000170-73) that Vaxcel reproduces, as the diode voltage ($V_D$) stops increasing (at 0.7 V). A POSITA would be confused by the patent's incorrect use of forward voltage ranges as threshold and maximum voltages. As Ex. 15 (JA-000170-73) explains, "there are no true 'thresholds' in a diode's electrical behavior". JA-000171.

Second, Vaxcel seems to alter its constructions for Vth and Vmax from values that are certain and known (the minimum voltage to emit light and the maximum voltage to avoid damage)

---

[10] Vaxcel mischaracterizes HeathCo's position as arguing for indefiniteness "because those data sheets employ industry standard rather than scholastic terminology." *Supra* at 43. It is true that the datasheets employ "industry standard" terminology but HeathCo made no distinction between different "terminology." To the extent Vaxcel is arguing that the patent uses "scholastic" instead of "industry standard" terminology and that there is a difference, that is further evidence that a POSITA would not know which to choose from.

to undefined ranges where things "could" happen "around" some values. *See supra* at 43-44. This proves HeathCo's point. Are Vth and Vmax known values per LED as the patent states, or are they ranges "around" where things "could" happen?

Third, Vaxcel claims that any discrepancies are resolved because the POSITA can read the datasheet "just as HeathCo did." *Supra* at 44. But that is the source of the discrepancy. A POSITA would be confused because the patent identifies certain values for Vth and Vmax that are contradicted by the datasheets. Vaxcel also makes a confusing argument about bins and LEDs in series and selecting resistors that, in any event, is inapposite. *Id.* The combination of LEDs in series does not mean the series combination as a whole has a "lowest" Vth and "highest" Vmax; each individual LED has its own Vth and Vmax.

Finally, Vaxcel proves HeathCo's point that "Vmax" has nothing to do with avoiding damage because the portions of the datasheets it cites are about *current*, not *voltage*. *Supra* at 44. There is a maximum forward current that relates to damage, not a maximum forward voltage, which Vaxcel makes clear with its citations and lack of evidence to the contrary.

### f.    "Connected in Parallel"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| V/H. **Connected in Parallel** '947 Patent, claim 20 '902 Patent, claim 23 '691 Patent, claims 1, 2, 59, 77 '916 Patent, claims 1, 2 '292 Patent, claim 15, 23, 36, 79, 80 '032 Patent, claim 2 | Two or more components, such as but not limited to LEDs, connected in a manner that one respective end of each of the two or more components is electrically terminated to a third component, such as but not limited to a voltage source, and the other respective end of each of the two or more components is electrically terminated to a fourth component, such as but not limited to a processor. | Connected to common points at each end; not in series |

46

### i.     Plaintiff's Opening Position

The claims in the '947, '902, '691, '916, '292 and '032 Patents use the phrase "connected in parallel" in relation to two separate circuit elements.  Using the '691 Patent as exemplary of each of the patents, the claims refer to both individual LEDs within the "LED load [being]…designed with a configuration of…in parallel connections" (e.g. ACLED1 and ACLED2 of Fig 6 reproduced in relevant part:  ) and "the first LED load and the second LED load [being] connected in parallel and…respectively and electrically coupled to the first controllable switching device and the second controllable switching device of the switching circuitry" (e.g. N Number LEDs and M number LEDs of Fig. 1D reproduced in relevant part:

While these circuit elements are both connected in parallel, the ACLEDs share a connection at both ends while the LED loads share a common connection to V+ but are not commonly connected again until they connect through their respective switching circuits.  Both configurations fall within the **ordinary and customary meaning** of connected in parallel and as such, no construction is required.  However, should a construction be deemed required, the construction must be sufficiently broad to cover both of these parallel configurations and should be "**Two or more components, such as but not limited to LEDs, connected in a manner that one respective end of each of the two or more components is electrically terminated to a third component, such as but not limited to a voltage source, and the other respective end of each**

47

**of the two or more components is electrically terminated to a fourth component, such as but not limited to a processor.**"

### ii.  Defendant's Answering Position

There can be no reasonable dispute over the meaning of "connected in parallel" in electrical circuits. HeathCo's construction of this most common, well-known technical term is its plain and ordinary meaning. *See, e.g.,* JA-000012 ("parallel circuit: an electric circuit in which the elements … are connected between two points, with one of the two ends of each component connected to each point."), JA-000071 ("two-terminal elements are connected in parallel when they are connected between the same pair of nodes"). In parallel circuits, current must be split between the parallel paths and the voltages across each parallel component must be equivalent. *See, e.g.,* JA-000263; JA-000026; JA-000268.



JA-000263. Here, $I_1 + I_2 = I$, and the voltages $V$ are the same.

There is no lexicography in any asserted patent to depart from this ordinary meaning, nor does Vaxcel argue there is any. HeathCo's construction is correct.

Vaxcel's construction, in contrast, is litigation-driven and objectively baseless. It would allow for intervening elements on either node as long as they eventually terminate at some common element. Under its construction, it is difficult to imagine what is ***not*** "connected in parallel." For

48

instance, in the following circuit on the left, R1 and R3 would be "connected in parallel" under

Vaxcel's construction:



JA-000270-73.

This is a "series," and not "parallel," circuit (which agrees with the parties' agreed construction of

"series" – "connected so that the same current passes through each element individually" – and is

properly labeled as such in the source document). Vaxcel's construction requires two things. First,

that "one respective end of each of the two or more components is electrically terminated to a third

component." Both R1 and R3 meet this condition, as they both "electrically terminate" to a voltage

source (the component between nodes "1" and "4"). Second, that "the other respective end of each

of the two or more components is electrically terminated to a fourth component." Both R1 and R3

meet this condition, as they both "electrically terminate" to a fourth component, namely, R2. But

R1 and R3 are plainly not in parallel.

As reflected in the above table on the right, a parallel circuit meets HeathCo's construction.

Vaxcel's construction is groundless. HeathCo's construction is the plain and ordinary meaning and

should be adopted.

### iii.    Plaintiff's Reply Position

After reviewing HeathCo's analysis of Vaxcel's proposed claim construction, for the term

"connected in parallel," it is apparent that neither Vaxcel's proposed construction nor HeathCo's

proposed construction are appropriate. Vaxcel's proposed construction is too broad as illustrated

by the fact that it can indeed read on a series circuit. HeathCo's proposed construction is too narrow as it would improperly omit a claimed embodiment of the patents.  By way of a non-limiting example, claim 10 of the '902 Patent recites: wherein the first set of N number LEDs and the second set of M number LEDs are connected in parallel, wherein the first switching device is electrically connected in series between the first set of N number LEDs and the power supply unit, wherein the second switching device is electrically connected in series between the second set of M number LEDs and the power supply unit:



Under HeathCo's construction, the above LEDs would not be in series as the bottom of the N LEDS and the bottom of the M LEDs are not "connected to a common point."  HeathCo, however, in its analysis did identify a construction that would include the above embodiment but not be so broad as to include a series circuit; namely, connection of components within a circuit in a manner in which there are multiple paths between/among which the current is divided and wherein the voltages across each parallel component are equivalent. (*See, e.g.*, *supra* at 48-59; JA-000263; JA-000026; JA-000268).  Vaxcel would agree to this construction and respectfully requests that the Court adopt it for "connected in parallel."

### iv.    Defendant's Sur-Reply Position

Vaxcel now recognizes that its construction is unacceptable since it would read on a series circuit, but its last-ditch attempt at salvaging its untenable position is still erroneous.  Parallel components ***must*** be connected between common points at each end; there is no correct definition that does not include this requirement.  Vaxcel's complaint that the LEDs in its own imagined

circuit not depicted anywhere in the patents would not qualify as "connected in parallel" under HeathCo's construction is true,[11] but that just shows that HeathCo's construction is correct, not that the construction should be forced to conform to Vaxcel's circuit.

Vaxcel cites claim 10 of the '902 Patent and creates its own figure alleging it embodies that claim. *Supra* at 49-50. It does not, because the M LEDs are not in parallel with the N LEDs; rather, the N LEDs *plus* the first switching device are in parallel with the M LEDs *plus* the second switching device. This is confirmed by the specification's description of Figure 6 (annotated below), which, unlike Vaxcel's figure, does embody claim 10.



FIG. 6

The '902 Patent describes this arrangement, which confirms that ACLED1 (N LEDs) and ACLED2 (M LEDs) are in parallel, and both are in series with switches 652 and 651:

> The parallel-connected ACLED**1** and ACLED**2** are series-connected to the switch **652** to produce double luminous power, and of which the ACLED**3** is parallel connected to, to generate triple luminous power, and of which an AC power source is further coupled to through the switch **651**.

'902 Patent at 10:54-59. In addition, ACLED3 is *not described* as in parallel with ACLED1 and ACLED2, but with the *entire arrangement* of ACLED1, ACLED2, and switch 652.

---

[11] Vaxcel states in error that the LEDs would not be in *series* under HeathCo's construction. *Supra* at 50. The context indicates Vaxcel means parallel, not series.

Vaxcel's new construction omits a necessary feature of "connected in parallel." The patents use the ordinary (correct) meaning. Even if the Court finds claim 10 is intended to cover Vaxcel's figure it "may not redraft claims, whether to make them operable or to sustain their validity." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

g.   **"Wherein the First Switching Device and the Second Switching Device are Connected with the First Set of N Number LEDs and the Second Set of M Number LEDs"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H.  **Wherein the First Switching Device and the Second Switching Device are Connected with the First Set of N Number LEDs and the Second Set Of M Number LEDs** '902 Patent, claim 15 '292 Patent, claim 15 | No construction is necessary.<br><br>However, if it is deemed that a construction is required then the construction should be:<br><br>The first switching device is connected to the first set of N number of LEDs and the second switching device is connected to the second set of LEDs. | The first and second switching devices are each connected with both the first set of N number LEDs and the second set M number LEDs |

i.   **Plaintiff's Opening Position**

This phrase is found in claim 15 from the '902 Patent and the '292 Patent. The only disagreement between the parties is whether this language provides that the first switching device is connected to the first set of N number LEDs and the second switching device is connected to the second set of M number LEDs or that the switching devices are both connected to both sets of LEDs.

Vaxcel asserts, since the only figures that include separate LED loads having N and M number LEDs (1C and 1D replicated in relevant part in Section F above) illustrate separate connections (arrows) from the switches to the LED loads, each switch is connected to a single

52

LED load.  Had the intent of the above language been to have both switches connected to both LED loads then only a single arrow would connect the larger boxes. Accordingly, the above language is clear, and no construction is required.   However, should it be deemed that a construction is required, the construction should be: "**The first switching device is connected to the first set of N number of LEDs and the second switching device is connected to the second set of LEDs.**"

### ii.    Defendant's Answering Position

The plain meaning of this claim term requires *each* of the first and second switching devices to be connected with *both* the first and second sets of LEDs.  The claim requires that "the first switching device *and* the second switching device are connected with the first set of N number LEDs *and* the second set of M number LEDs."  If the claim meant anything other than HeathCo's construction, it would use more open-ended language such as "and/or."  In fact, this is exactly what the patentee did elsewhere.  For example, one patent claims "the first set of N number LEDs and the second set of M number LEDs … are respectively designed with a configuration of in series *and* in parallel connections of LEDs" ('902 Patent, cl. 10) while another claims "the first set of N number LEDs and the second set of M number LEDs … are respectively designed with a configuration of in series *and/or* in parallel connections of LEDs" ('292 Patent, cls. 1, 15).

The specifications confirm HeathCo's construction (based on plain English).  In the embodiments of Figures 3A and 3B, both switching devices Q1 and Q2 are clearly connected to both sets of LEDs and are described as such.  '902 Patent at 6:64-7:29, '292 Patent at 7:6-38.  In the embodiments of Figures 1C and 1D, each switching device is shown connected to both sets of LEDs.  These figures depict both switching devices inside the "loading and power control unit" 140, which shows two connections from the LPCU connecting to light emitting unit 150, which contains both sets of LEDs.  '902 & '292 Patents at 5:35-44.  The specification provides that "[t]he

53

loading and power unit 140 may control the light-emitting unit 150 to generate at least two levels of illumination variations." *Id.* There is no description of the switching devices individually controlling or connected to individual sets of LEDs. There are not even reference numbers for the switching devices or the LED sets (in contrast to the microcontroller), since there is no reason to refer to them individually.

Vaxcel does not even discuss the plain language of the claims. It relies solely on its argument that there are separate arrows purportedly "from the switches to the LED loads, each switch is connected to a single LED load." *Supra* at 52-53. Not so. The arrows indicate that there are two connections from the LPCU which contains each of the switching circuits connecting to the entire "light-emitting unit" 150 which contains both sets of LEDs. Even if the arrows correspond to each switching device internal to the LPCU, there is no indication that they also correspond to only one set of LEDs. Even if Vaxcel's interpretation is one possibility, it is not the only one. Nothing in the specification contradicts the plain language of the claims. And even if Vaxcel's interpretation of individual figures corresponding to individual embodiments is correct, its construction would impermissibly import the limitations of specific embodiments into the claims.

### iii.    Plaintiff's Reply Position

HeathCo's proposed construction is overly narrow and incorrect because it would render dependent claims inoperable. This term is found in claim 15 from the '902 Patent and the '292 Patent. Claim 23 of the '902 patent which depends from and further defines claim 15 of the '902 Patent and claim 23 of the '292 Patent which depends from and further defines claim 15 of the '292 Patent both recite:

> wherein the first set of N number LEDs and the second set of M number LEDs are connected in parallel, wherein the first switching device is electrically connected in series between the first set of N number LEDs and

the power supply unit, wherein the second switching device is electrically connected in series between the second set of M number LEDs and the power supply unit;

A switch cannot be connected in series with one set of LEDs and still be connected to the other set of LEDs when the two sets of LEDs are connected in parallel with each other.

In light of the above, the Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv.  **Defendant's Sur-Reply Position**

Vaxcel makes a similar error here as it did with "connected in parallel", i.e., that its imagined circuit must be an embodiment of this limitation.  First, Vaxcel is incorrect that HeathCo's construction would make its identified claims "inoperable."[12]  Contrary to Vaxcel's assertion that "a switch cannot be connected in series with one set of LEDs and still be connected to the other set of LEDs when the two sets of LEDs are connected in parallel with each other," both the M and N sets of LEDs are connected to both the first and second switching devices.  *See supra* at 51 (Figure 6).  Second, even if Vaxcel were correct that HeathCo's construction would make this limitation inoperable (it would not), the proper construction cannot be disturbed merely because the claim is poorly drafted.  *Chef America*, 358 F.3d at 1374.

### h.  **"Creation of an Aesthetic Night Scene/Soft Evening Light to Feature an Aesthetic Night View Around the Living Area both for Indoor and Outdoor Need/Soft and Warm Light to Feature an Aesthetic Night View Around the Living Area Both for Indoor and Outdoor Need"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Creation of an Aesthetic Night Scene** '947 Patent, claim 20 '032 Patent, claim 1 '292 Patent, claim 79 | No construction is necessary.<br><br>However, if it is deemed that a construction is required then the construction should be: | Indefinite |

---

[12] The limitation Vaxcel identifies is identical to the limitation it identifies for "connected in parallel."

| | | |
|---|---|---|
| **Soft Evening Light to Feature an Aesthetic Night View Around the Living Area both for Indoor and Outdoor Need** '902 Patent, claim 15 <br><br> **Soft and Warm Light to Feature an Aesthetic Night View Around the Living Area Both for Indoor and Outdoor Need** '292 Patent, claims 15, 79 | at dusk the LED security light is automatically turned on by the photo sensor to perform the low level illumination | |

### i.    Plaintiff's Opening Position

The "creation of an aesthetic night scene" or the variations thereof in the '947, '032. '292, '902 and '292 Patents merely describe an easily understood effect of turning on the light with a low-level illumination and, in some instances, a low color temperature.  The specification of the '947 Patent, which exemplifies the identified patents, discloses:

> the life-style lighting solution of the present disclosure is featured with two innovations…the first innovation is the creation of an aesthetic scene for the outdoor living environment, wherein at dusk the LED security light is automatically turned on by the photo sensor to perform the low level illumination…creating a soft and aesthetic night scene for the outdoor living area (such soft and aesthetic night view is not achievable by the high level illumination however) (D.I. 64-1 Exhibit B, Col. 14, ll. 34 – 44)

Basically, the disclosure is contrasting the aesthetic value of a low illumination during the darkness of night with the harshness of a high-level illumination.  Since these phrases are easily discernable from the plain claim language, no construction is required.  However, should the Court deem it necessary to construe these terms they should be construed to be "**at dusk the LED security light is automatically turned on by the photo sensor to perform the low level illumination**" or alternatively "**an effect of the LED security light being automatically turned on at dusk by the**

**photo sensor to perform the low level illumination**." (alternate construction not previously presented).

### ii.    Defendant's Answering Position

A claim fails to "particularly point[] out and distinctly claim[] the subject matter which the inventor [] regards as the invention" (35 U.S.C. § 112(2)) if, when read in light of the specification and the prosecution history "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 900. The "creation of an aesthetic night scene" (and variants) limitations fail to inform a POSITA, with reasonable certainty, of the scope of the invention.

Here, much like the indefinite term "aesthetically pleasing" at issue in *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342 (Fed. Cir. 2005), the "creation of an aesthetic night scene" terms involve terms of degree – aesthetic night scene, soft evening light, aesthetic night view, soft and warm light. The asserted patents that include these terms, however, fail to provide any "objective boundaries for those of skill in the art" and thus run afoul of the definiteness requirements set forth in *Nautilus*, 572 U.S. 898 & n.8.[13] Whether a "night scene" or "night view" is "aesthetic" is highly subjective. The patents provide no guidance as to when such a "night

---

[13] Although *Datamize* was decided prior to *Nautilus*, the rationale employed by the Court in *Datamize* to find the term "aesthetically pleasing" indefinite comports with the standards set forth in *Nautilus*. In *Datamize*, the Federal Circuit stated, "Datamize has offered no objective definition identifying a standard for determining when an interface screen is 'aesthetically pleasing.' In the absence of a workable objective standard, 'aesthetically pleasing' does not just include a subjective element, it is completely dependent on a person's subjective opinion. To the extent Datamize argues that such a construction of 'aesthetically pleasing' does not render the phrase indefinite, we disagree. The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." *Datamize,* 417 F.3d at 1350. The Federal Circuit applied a similar analysis, post-*Nautilus*, in finding claims including the term "unobtrusive manner" invalid in *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1374 (Fed. Cir. 2014). The Federal Circuit also referenced *Datamize* with approval in the *Interval Licensing* opinion. *Id.* at 1371-1374.

scene" or "night view" is "aesthetic" or not.  Indeed, the specification language that Vaxcel relies

upon ('947 Patent at 14:34-44) demonstrates the highly subjective nature of these terms.  That

language, which includes portions replaced by ellipsis in Vaxcel's brief (underlined below) states:

> the life-style lighting solution of the present disclosure is featured with two innovations which meaningfully improve the exquisite tastes of living in the evening, the first innovation is the creation of an aesthetic scene for outdoor living environment, wherein at dusk the LED security light is automatically turned on by the photo sensor to perform the low level illumination with a low color temperature which is necessary for creating a soft and aesthetic night scene for the outdoor living area (such soft and aesthetic night view is not achievable by the high level illumination however), the second innovation is the creation of a navigation capacity similar to a light house effect for guiding people to safely move toward a destination in the outdoor living area without getting lost or encountering an accident.  These two innovative functions coupled with the motion sensor to increase illumination when people enters [sic] into the short detection area makes the present invention a perfect life-style lighting solution for enjoying an exquisite taste of evening life.

'947 Patent at 14:34-52.  This portion of the specification informs a POSITA that low-level

illumination with a low color temperature is *necessary* for "creating a soft and aesthetic night

scene."  However, nowhere is a POSITA informed with objective boundaries of what is *sufficient*

for creating a soft and aesthetic night scene.  *See, e.g., Intellectual Ventures I LLC v. T-Mobile

USA, Inc.*, 2018 WL 5809270 at *13-14 (E.D. Tex. Nov. 6, 2018) (finding term "to optimize end-

user quality of service (QoS) for an internet protocol (IP) flow" indefinite based on inclusion of

"optimize").  Vaxcel's construction echoes the necessary but not sufficient language of the

specification.  Because the specifications do not disclose detail sufficient for a POSITA to

determine, using objective boundaries, when a night scene or night view is "aesthetic," these terms

are indefinite.  Similarly, because they fail to disclose when evening light is sufficiently soft (or

soft and warm) to achieve the "aesthetic night scene" or "aesthetic night view," these terms are

indefinite.

58

### iii.    Plaintiff's Reply Position

HeathCo asserts that the term "aesthetic" has a purely subjective meaning, and the terms "low level illumination" and "low color temperature" are not sufficiently bounded. HeathCo is incorrect on all three counts. Rather than analyzing the word aesthetic as it is used in the claim, in view of the specification, HeathCo instead simply makes the conclusory assertion that it is the same as "aesthetically pleasing" and since "aesthetically pleasing" has been found by the courts to be subjective and indefinite so is the term aesthetic. This is a non-sequitur. The part of "aesthetically pleasing" that is subjective is the word "pleasing," not the word "aesthetic." Admittedly, what is "pleasing" to one person may not be "pleasing" to another person and thus that term as applied to any term (i.e., "aesthetically") would make that term entirely subjective. Here however, the term "aesthetic" is used without a subjective aspect. Instead, the word is being used to differentiate the artful aspect of the light versus the functional navigation, prevention of a hardship of light and security aspects of the light. According to www.dictionary.com, the definition of "aesthetic" is "relating to the philosophy of aesthetics; concerned with notions such as the beautiful and the ugly." JA-000345-52. Notably, the word "aesthetic" by itself does not relate to the degree of beauty or ugly as perceived by a person, just the philosophy thereof. As such, there is nothing subjective about the term "aesthetic" and HeathCo's unsupported assertion otherwise should be rejected.

Regarding low color temperature, in addition to the fact that not all of the claims require this feature, "a patent need not teach, and preferably omits, what is well known in the art." (*See, e.g., Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986)). According to The National Lighting Product Information Program (NLPIP) at Rensselaer Polytechnic Institute ("RPI") it has been "lighting industry convention" at least since 2004 that lights with "low CCT [correlated color temperature] values (2700 K to 3000 K) provide light that

59

appears 'warm.'" JA-000353-55. And this convention was still the convention in 2018. *See, e.g.*, JA-000356-58. As such, HeathCo's assertion that this term is indefinite is also incorrect and should be rejected.

Finally, regarding the low level illumination, the Suit Patents explicitly disclose that in at least one embodiment the low level illumination mode is 30% of the total illumination (*see, e.g.*, '947 Patent Col. 14: 22-32), in at least one embodiment the low level illumination mode is 1/3 that of the high level illumination mode (*id.,* Col. 11: 15-24), and in at least one embodiment, the low level illumination mode is 1/6 that of the high level illumination mode (*id.,* Col. 11: 62 - 63). Thus, a POSITA would have a clear understanding of the level of brightness the low level illumination mode provided.

Because all of HeathCo's assertions fail, the Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv.    **Defendant's Sur-Reply Position**

In its zeal to demonstrate that "aesthetic" is not subjective, Vaxcel proves the exact opposite. Vaxcel asserts, without support, that the term aesthetic "is used without a subjective aspect," yet in the same breath asserts "the word is being used to differentiate the ***artful aspect*** of the light versus the functional [] aspects of the light." *Supra* at 59 (emphasis added). Vaxcel is under the misconception that an artful aspect of the light is not subjective. That the claim, according to Vaxcel, requires an "artful aspect" brings it squarely within the ambit of the "aesthetically pleasing" line of cases cited by HeathCo.

i.   **"Creation of a Navigation Capacity Similar to a Light House for Guiding People to Safely Walk to a Destination in an Outdoor Living Area/ Create a Navigation Capacity Similar to a Light House to Help People Move to a Destination Without Getting Lost or Encountering an Accident"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Creation of a Navigation Capacity Similar to a Light House for Guiding People to Safely Walk to a Destination in an Outdoor Living Area** ('947, '032, '292) **Create a Navigation Capacity Similar to a Light House to Help People Move to a Destination Without Getting Lost or Encountering an Accident** ('902, '292) | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: at dusk the LED security light is automatically turned on to perform the low level illumination which lights up the darkness | Indefinite |

i.   **Plaintiff's Opening Position**

The "creation of a navigation capacity similar to a light house for guiding people to safely walk to a destination in an outdoor living area" or the variations thereof in the '947, '032, '292, '902 and '292 Patents merely describe another easily understood effect of turning on the light with the low-level illumination and, in some instances, a low color temperature.

Basically, the disclosure is highlighting the practical value of having a light available during the darkness of night.  As with a light house that reveals potential hazards in the water such as large rocks, etc. the security light, *inter alia*, reveals potential hazards in a yard such as holes,

uneven walkways, etc. Since these phrases are easily discernable from the plain claim language, no construction is required. However, should the Court deem it necessary to construe these terms they should be construed to be "**at dusk the LED security light is automatically turned on to perform the low-level illumination which lights up the darkness**" or alternatively "**an effect of the LED security light being automatically turned on at dusk by the photo sensor to perform the low level illumination**." (alternate construction not previously presented).

### ii.    Defendant's Answering Position

These terms suffer the same indefinite fate as the "creation of an aesthetic night scene" terms. Obviously, the term "similar" injects a subjective determination into whether the limitation has been met. However, neither the claims nor the specification provide objective boundaries for determining when a "navigation capacity" has been created that is "similar" to that of a light house. As such, these terms are indefinite under *Nautilus*.

Separately, Vaxcel's proposed construction cannot be correct. Vaxcel proposes a construction for these terms that are essentially identical to its construction for the "aesthetic night view" terms – that is, at dusk automatically turn on the low level light. In Vaxcel's view, automatically turning on low level light at dusk, whatever that level might be and regardless of any other conditions existing in the relevant space (such as other lighting sources in the area), creates both an aesthetic night view and a navigation capacity similar to a light house. In addition to demonstrating the indefiniteness of both terms, Vaxcel's construction runs afoul of the presumption that different meanings attach to different claim terms. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1579 (Fed. Cir. 1996).

### iii.    Plaintiff's Reply Position

HeathCo sets forth two conclusory statements in support of its assertion that these terms are indefinite; namely, the word "similar" is subjective (without providing any analysis) and

Vaxcel's proposed construction runs afoul of the presumption that different meanings attach to different claim terms.

According to www.dictionary.com, the definition of "similar" is "having a likeness or resemblance, especially in a general way." JA-000359-64. There is no degree or sufficiency of similarity required by the claim language and according to the definition, it can be a general likeness and still be "similar." Here, at the very least, both a lighthouse and the security light provide light. That commonalty alone is sufficient to meet the definition of "similar," without requiring any subjective thought.

As for Vaxcel's proposed construction, the plain claim language recites that this term and the previous term are merely descriptions of innovations created by operating the light in the low level illumination mode (*see, e.g.,* '947 Patent, claim 20: "wherein during the performance of the low level illumination mode, the low level illumination creates two life-style innovations for performing a life-style lighting solution").

In light of the above, the Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv.     **Defendant's Sur-Reply Position**

HeathCo previously noted that, like the *aesthetic* claim terms, the navigation capacity terms provide no objective boundaries and thus run afoul of *Nautilus.* Vaxcel asserts the use of the term "similar" in the navigation capacity terms is not subjective yet offers no objective boundaries by which anyone could determine whether the navigation capacity created was sufficient to meet the limitations. Shockingly, Vaxcel asserts "[t]here is no degree or sufficiency of similarity required by the claim language and [] it can be a general likeness and still be 'similar.'" Indeed, Vaxcel appears to assert that merely providing light of any kind or amount is "similar" to the navigation capacity provided by a light house. *Id.* at 16. Vaxcel's position is substantially similar to that

advanced by the plaintiff in *ACQIS LLC v. Alcatel-Lucent USA Inc.*, No. 6:13-cv-638, 2015 WL 1737853 (E.D. Tex. April 13, 2015), where the Court found the term "similar in design" to be invalid.  In attempting to provide objective boundaries for the term, the Court found that "ACQIS's arguments suggest that the only base reference for similarity is actually 'identity.'"  *Id.* at *10. Here, Vaxcel's only argument for an objective boundary for "similar" is any light at all makes a light similar to a light house.  This provides no limits whatsoever and renders the claims indefinite.

### j.    "Low/High [Light] Color Temperature"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Low [Light] Color Temperature** '902 Patent, claims 15, 29 '292 Patent, claim 15 '691 Patent, claims 1, 59, 65 '916 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be:<br><br>LED having a color temperature at or near 2700K | Indefinite |
| H. **High [Light] Color Temperature** '902 Patent, claims 15, 29 '292 Patent, claim 15 '691 Patent, claims 1, 59, 65 '916 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be:<br><br>LED having a color temperature at or near 5000K | Indefinite |

### i.    Plaintiff's Opening Position

The claims in the '902, '292, '691 and '916 Patents use the phrases "high [light] color temperature" and "low [light] color temperature" to describe the light emitted from the different LED loads.  The color temperature of light is measured in degrees Kelvin. (See e.g. https://www.lightbulbsdirect.com/colortemp: "Color temperature is a description of the warmth or coolness of a light source. Higher color temperatures (3600–5500 K) are consider cool and lower color temperatures (2700–3000 K) are considered warm.").

The specification of the '902 Patent, which is exemplary of the relevant identified Patents, discloses that a color temperature of 2700K may be associated with a low-power lighting source and a color temperature of 5000K may be associated with a high-power lighting source (D.I. 64-2 Exhibit E, Col. 11, ll. 17 - 23).  As such, it would be apparent that a "low [light] color temperature" is approximately 2700K and a "high [light] color temperature" is approximately 5000K.

In light of the above, Vaxcel respectfully submits that these claim phrases do not require construction, however is the Court deems it necessary to construe these terms, the constructions should be "**LED having a color temperature at or near 5000K**" for "**high color temperature**" and "**LED having a color temperature at or near 2700K**" for "**low color temperature**."

### ii.      Defendant's Answering Position

Claim 15 of the '902 Patent includes three related terms, each of which is indefinite.  That claim, in relevant part, reads as follows (with the relevant terms bolded):

> wherein the N number LEDs emit light with a **low color temperature** to produce a soft evening light to feature an aesthetic night view around the living area both for indoor and outdoor need while at the same time creating a navigation capacity similar to a light house to help people move to a destination without getting lost or encountering an accident, wherein the M number LEDs emit light with a **high color temperature** to produce a **much brighter day light** with a **dual effect of security alert by means of creating drastic changes in both light intensity from low to high and light color temperature from warm to cool upon detecting a motion intrusion**, wherein the high level illumination with a day light high color temperature enables people to have a high visibility of the surrounding environment when needed

*Id*. at 18:36-50 (emphasis added).  HeathCo has shown above that there are two portions of this limitation that are indefinite: the "aesthetic night view" aspect; and the "navigation capacity" aspect.  But the lack of clarity and absence of objective boundaries for a POSITA to determine the scope of this limitation do not end there.  Rather, there are three additional aspects of this limitation (and its related limitations in other claims as identified in the Joint Claim Construction Chart (D.I.

65

64)).  These other three indefinite aspects are closely tied to the purported "aesthetic night view" and "navigation capacity," but are also independently indefinite.

Claim 15 of the '902 Patent includes the terms "low color temperature" and "high color temperature."[14]  The terms high and low are, obviously, relative terms (or terms of degree).  While under the post-*Nautilus* indefiniteness analysis terms of degree are not "inherently indefinite" in light of the Supreme Court's decision, the Federal Circuit has held that claims having terms of degree will fail for indefiniteness unless they "provide objective boundaries for those of skill in the art" when read in light of the specification and the prosecution history. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014).

There is no evidence that "low color temperature" and "high color temperature" are terms of art of that they were specifically defined by the inventors.  Vaxcel makes no such claim.  Rather, Vaxcel points to exemplary language in the specification that provides no objective boundaries for determining whether a ***color temperature*** is low or high.  Indeed, the specification excerpts Vaxcel identifies speak in terms of high (or low) power and high (or low) illumination levels.  (*See, e.g.*, '902 Patent at 7:9-14 and 11:17-18.  None of these cites relate all to the meaning of "color temperature."  Because of the absence of objective criteria in the specifications, Vaxcel is forced to leap to the unsupported conclusion that "it would be apparent that a 'low [light] color temperature is ***approximately*** 2700K and a 'high [light] color temperature" is ***approximately*** 5000k."  *Supra* at 65 (emphasis added).  Vaxcel's proposed constructions echo the imprecision introduced by the word "approximately" by proposing that "high [light] color temperature" means

---

[14] These terms, or the related (and synonymous) terms "high light color temperature" and "low light color temperature," are also found in '902 Patent claim 29, '292 Patent claim 15, '691 Patent cls. 1, 59, and 65, and '916 Patent cl. 1.

66

an "LED having a color temperature *at or near* 5000k" and that "low [light] color temperature" means an "LED having a color temperature *at or near* 2700k."

Neither Vaxcel nor the specifications provide any guidance as to how much of a range around each of these values is provided by the vague "at or near." For example, neither the specification nor Vaxcel's proposed construction informs a POSITA as to how low on the K scale a color temperature can be and still be a "high color temperature." Similarly, neither the specification nor Vaxcel's proposed construction informs a POSITA as to how high on the K scale a color temperature can be and still be a "low color temperature." Vaxcel's opening position (*supra* at 64-65) purports to quote from https://www.lightbulbsdirect.com/colortemp. But even that extrinsic source supports HeathCo's position that the terms are indefinite and provide no objective boundaries. Rather than defining "high" and "low" the website speaks in terms of higher and lower – thus providing no objective boundaries. Failure to provide objective boundaries for "low" and "high" claim terms has been found by other courts to render claim terms indefinite. *See, e.g., Signal IP v. Am. Honda Motor Co., Inc.,* 2015 WL 5768344, at *56-58 (C.D. Cal. Apr. 17, 2015) (finding that it was "unclear how an expert could consistently discriminate between relatively high and low torque demands" and that "a skilled artisan would have difficulty determining regions of relatively high or low efficiency" as "this term is almost entirely subjectively determined"; similarly finding "regions of relatively high and low efficiency" indefinite: "The expert testimony shows that a skilled artisan would have difficulty determining regions of relatively high or low efficiency, much as described above regarding term no. 24. Indeed, Ronney's testimony indicates that this term is almost entirely subjectively determined. This does not define the scope of the invention with 'reasonable certainty.'")

67

Still further, and unmentioned by Vaxcel, lightbulbsdirect.com states, "***Confusingly***, higher Kelvin temperatures (3600–5500 K) are what we consider cool and lower color temperatures (2700–3000 K) are considered warm" (emphasis added). This demonstrates that the logical leap employed by Vaxcel is unsupported and inappropriate. Because the specification provides no guidance as to the range for "high" or "low," these terms are indefinite. *See, e.g., In re Walter,* 698 Fed. App'x 1022, 1026-1027 (Fed. Cir. 2017) ("Here, 'block-like' is a term of degree without any accompanying guidance in the intrinsic record for determining its scope. The term ostensibly covers a range of shapes that are sufficiently 'like' a 'block' and excludes those that are not. But nothing in the intrinsic record offers 'objective boundaries' for ascertaining whether a given shape falls into either category. . . When, as here, 'nothing in the specification, prosecution history, or proper [sic] art provides any indication as to what range of [structures] is covered by the term,' the claim is indefinite.") (citing *Amgen, Inc. v. Chugai Pharm. Co., Ltd.* 927 F.2d 1200, 1218 (Fed. Cir. 1991)).

### iii.    Plaintiff's Reply Position

HeathCo reasserts its arguments from the previous two terms and then adds an additional assertion that the term high color temperature is indefinite for the same reason asserted against low color temperature. Vaxcel has already proved that the terms "aesthetic" and "similar" are not subjective terms as recited in the claims and directs the Court's attention to the analysis in paragraphs H and I above for further explanation. Vaxcel has also identified in paragraph H above that "low color temperature" is a conventional industry term that has specific boundaries (2700 K to 3000 K) (*see, e.g.*, JA-000353-55; JA-000356-58). The same exhibits also provide that lighting industry convention provides that "lamps having high CCT values (4000 K to 6500 K) provide light that appears 'cool'" (*see, e.g.*, JA-000353-55; JA-000356-58).

The Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv.    Defendant's Sur-Reply Position

Vaxcel relies solely on previously un-cited extrinsic evidence to alleged that a POSITA would know what is meant by low color temperature (2700 K to 3000 K) and high color temperature (4000 K to 6500 K).  Based solely on a citation to a single web page, Vaxcel asserts that this "convention" still applied in 2018.  Vaxcel provides no expert declaration confirming any of these allegations which are, in part, based on a webpage for an LED company headquartered in India with no known connection to the asserted patents, the parties, or this litigation.  *See* https://elmerindia.com/about-us/.

### k.    "Much Brighter Day Light"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Much Brighter Day Light** '902 Patent, claim 15 '292 Patent, claim 15 | No construction is necessary.<br><br>However, if it is deemed that a construction is required then the construction should be:<br><br>LED having a color temperature at or near 5000K | Indefinite |

### i.    Plaintiff's Opening Position

Claim 15 of the '902 Patent recites "wherein the M number LEDs emit light with a high color temperature to produce a much brighter day light."  As stated above regarding high color temperature, the high color temperature is approximately 5000K which is customarily associated with daylight color.  Thus, the above language is comparing the high-level illumination of light emitted from the M number LEDs at a day light color with the low-level illumination of light emitted from the N number LEDs at 2700K which is considered warm white color.  The

69

specification further supports this at least at D.I. 64-2 Exhibit E, Col. 12, ll. 2-7:  "In addition, when a person is entering the predetermined detection zone, the lighting apparatus may switch from the low level illumination to the high level illumination, to provide the person with sufficient illumination or to generate strong illumination and hue contrast for monitoring the intruder."

Vaxcel respectfully submits that the phrase "much brighter day light" is not vague or ambiguous and is clearly ascertainable by the plain claim language and description in the specification.  As such, this claim term does not need construction.  However, should the Court deem it necessary to construe "**much brighter day light**" the construction should be "**LED having a color temperature at or near 5000K**."

### ii.    Defendant's Answering Position

Claim 15 of both the '902 and '292 Patents includes the term "much brighter day light." Obviously, "much brighter" is a term of degree and as such, the specification should inform a POSITA as to the objective boundaries of when the "day light" is **much** brighter.  *Nautilus*, 572 U.S. at 911 & n.8.  It does not.  Nor does Vaxcel's construction provide objective boundaries. Indeed, Vaxcel's construction for "much brighter day light" is identical to its construction for "high [light] color temperature."  In addition to failing to provide objective boundaries (for the same reasons identified above for "high color temperature"), the fact that both "much brighter day light" and "high color temperature" are used in the same claim indicates that they have different meanings.  *See, e.g., Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).  Accordingly, not only is Vaxcel's construction demonstrably wrong, the term "much brighter day light" has no objective boundaries and is indefinite.

### iii.   Plaintiff's Reply Position

HeathCo continues to perpetuate its erroneous assertion that the low color temperature and the high color temperature would be unknown to a POSITA because it is not explicitly disclosed in the specification.  However, as Vaxcel previously explained, these terms are conventional industry terms and thus a POSITA would be aware that low color temperature would fall within the range of (2700 K to 3000 K) and high color temperature within the range (4000 K to 6500 K). As Vaxcel explained in its opening brief, the low color temperature is conventionally associated with warm light (e.g., candlelight) and the high color temperature is conventionally associated with cool light (e.g., day light).  Thus, a POSITA would understand that LEDS illuminating with a color temperature in the range (4000 K to 6500 K) provide a "much brighter day light" than LEDs illuminating with a color temperature in the range (2700 K to 3000 K).

Regarding the similarity between Vaxcel's constructions, it is not erroneous because, as just explained, "high color temperature" refers to the degrees Kelvin and the much brighter day light reference correlates between the degrees K and the similarity to the light from the sun at different times of day.

The Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction for the term "much brighter day light."

### iv.   Defendant's Sur-Reply Position

Vaxcel does nothing to answer the question of *how much brighter* light must be to be "much brighter day light."  Vaxcel merely repeats its unsupported mantra that a "POSITA would understand that LEDS [sic] illuminating with a color temperature in the range (4000 K to 6500 K) provide a "much brighter day light" than LEDs illuminating with a color temperature in the range (2700 K to 3000 K)."  Notably absent is a specification cite or extrinsic evidence to support this

71

statement.  This is not surprising as the term "much brighter day light" does not appear in the specification.  Nor do the words of the claim help resolve this lack of objective boundaries because the claim uses four different terms, all of which Vaxcel asserts mean the same thing ("at or near 5000k"): "wherein the M number LEDs emit a light with a ***high color temperature*** to produce a ***much brighter day light*** with a dual effect of security alert by means of creating drastic changes in both ***light intensity*** from low to ***high*** and light color temperature from warm to ***cool*** upon detecting a motion intrusion, wherein the ***high level illumination with a day light high color temperature*** enables people to have a high visibility of the surrounding environment when needed."  '902 Patent at 18:42-50 (claim 15) (emphasis added).  Construing all of these terms to mean the same thing renders the claim multiply redundant.  This alone demonstrates the impropriety of Vaxcel's position.

l.      **"Dual Effect of Security Alert by Means of Creating Drastic Changes in Both Light Intensity From Low to High and Light Color Temperature From Warm to Cool Upon Detecting a Motion Intrusion"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Dual Effect of Security Alert by Means of Creating Drastic Changes in Both Light Intensity From Low to High and Light Color Temperature From Warm to Cool Upon Detecting a Motion Intrusion** '902 Patent, claim 15 '292 Patent, claim 15 | No construction is necessary.<br><br>However, if it is deemed that a construction is required then the construction should be:<br><br>Increasing the light intensity and changing the LED color temperature from at or near 2700K to at or near 5000K upon detecting motion. | Indefinite |

i.      **Plaintiff's Opening Position**

As previously discussed in subsections (j)(i) and (k)(i) above, 5000K is considered a high, but cool and 2700K is considered low and warm. Claims 15 from the '902 and '292 Patents recite:

72

> when a motion intrusion is detected…the loading and power control unit manages to turn on at least the second set of M number LEDs…to generate the high level illumination… the N number LEDs emit light with a low color temperature… the M number LEDs emit light with a high color temperature to produce a much brighter day ['902 patent only] light… with a dual effect of security alert by means of creating drastic changes in both light intensity from low to high and light color temperature from warm to cool upon detecting a motion intrusion, wherein the high level illumination with the high color temperature enables people to have a high visibility of the surrounding environment when needed…

Between this plain language of the claim, which sets forth the dual effects of a drastic change in illumination and color temperature resulting from a detection of motion; namely a security alert and high visibility and the corresponding disclosure of the specification (at least at D.I. 64-2 Exhibit E, Col. 12, ll. 2-7:  "In addition, when a person is entering the predetermined detection zone, the lighting apparatus may switch from the low level illumination to the high level illumination, to provide the person with sufficient illumination or to generate strong illumination and hue contrast for monitoring the intruder.") it is clear that this language is not vague or ambiguous and does not need to be construed.  However, should the Court deem it necessary to construe this term, Vaxcel respectfully submits that the proper construction should be "**Increasing the light intensity and changing the LED color temperature from at or near 2700K to at or near 5000K upon detecting motion**."

### ii.      Defendant's Answering Position

Claim 15 of both the '902 and '292 Patents includes the phrase "dual effect of security alert by means of creating drastic changes in both light intensity from low to high and light color temperature from warm to cool upon detecting a motion intrusion."  This term introduces numerous phrases that cause it to be indefinite in the same fashion as other terms described above. That is, neither the claim language itself nor the specification provide disclosure of any objective

boundaries for the claim.  Neither the specification nor the claim language provides any objective

boundaries enabling a POSITA to determine:

- when is light intensity low;
- when is light intensity high;
- what qualifies as a "drastic" change in light intensity;
- when is light color temperature low;
- when is light temperature high; or
- what qualifies as a drastic change in light color temperature.

This limitation would be indefinite if only one of these questions lacked objective

boundaries.  But *all* of these questions lack objective boundaries and a POSITA is left to guess

whether a change in light intensity and/or color temperature qualifies as a drastic change from low

to high.  *See, e.g., Baxter International, Inc. v. Becton, Dickinson and Co.,* 2020 WL 5191495, at

*12 (N.D. Ill. March 18, 2020) (finding "low melting temperature polymeric material" indefinite

because there was "no standard in the '237 patent by which a POSITA could determine what

melting temperature is low enough to qualify.").

### iii. Plaintiff's Reply Position

HeathCo lists six elements related to this claim term that it alleges are indefinite (low light

intensity, high light intensity, drastic change in light intensity, low color temperature, high color

temperature, and drastic change in light color temperature).  Once again, HeathCo is perpetuating

the same arguments. Vaxcel has already addressed low light intensity (30% of full illumination,

1/3 of high level intensity, 1/6 of high level intensity) in paragraph H above and directs the Court

to that paragraph for a more detailed explanation.  Vaxcel has already addressed low color

temperature (2700 K to 3000 K), high color temperature (4000 K to 6500 K) and the drastic change

in light temperature (from low color temperature to high color temperature) in at least paragraph

K above and directs the Court to that paragraph for a more detailed explanation.  The only two

74

elements that Vaxcel has not previously addressed directly are high light intensity and the drastic change in light intensity.

Regarding high light intensity, the Suit Patents explicitly disclose that in at least one embodiment the low level illumination mode is 30% of the total illumination (which would be the high light intensity) (*see, e.g.*, '902 Patent Col. 14: 25-35), in at least one embodiment the ratio of high level illumination mode to low level illumination mode is 3 to 1 (*id.* Col. 11: 11-16), and in at least one embodiment, the ratio of the high level illumination to low level illumination mode is 6 to 1 (*id.* Col. 11: 54 -57). These disclosed ratios of high light intensity to low light intensity are specifically identified as the strong/drastic change in illumination. (*Id.* Col. 11:63 -12:8.) Thus, a POSITA would be aware that a change in light intensity anywhere between at least 3 to 1 and 6 to 1 would be considered a drastic change in light intensity.

The Court should reject HeathCo's assertion that this term is indefinite and accept Vaxcel's proposed construction.

### iv. Defendant's Sur-Reply Position

Vaxcel directs the Court to '902 Patent at 11:63-12:8 and alleges that the ratios described at 11:11-16 and 11:54-57 are "specifically identified as the strong/*drastic* change in illumination." Vaxcel is wrong. Instead, the '902 Patent at 11:63-12:8 refers to "five exemplary embodiments" (not two) and never uses the word "drastic" (only strong). The word drastic only appears in the claims, not in the written description. Vaxcel has come forward with no evidence – intrinsic, extrinsic, or expert – to show that a POSITA would equate strong and drastic. For this reason alone, these terms are indefinite.

m.      **"Preloaded In A Mobile Device"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **Preloaded in a Mobile Device** '564 Patent, claims 1, 9 '367 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: Loaded in a mobile device prior to the APP being used for setting an operating parameter | loaded in a mobile device before the mobile device is purchased or first used |

i.      **Plaintiff's Opening Position**

The '564 and '367 Patents, *inter alia*, disclose and claim a software application that can be loaded on a mobile device. Claims 1 and 9 of the '564 Patent and claim 1 of the '367 Patent recite that the app is "preloaded in a mobile device". There is no disagreement regarding the meaning of a mobile device or even the meaning of being loaded in the mobile device. Essentially, HeathCo is requesting that the Court construe the "pre" aspect of the word preloaded. It is obvious from the disclosure of the specification and from the ordinary and customary use of the term preloaded that it simply means loaded on the mobile device before the app can be used to operate the light. There is no language in the claims, specification or prosecution history that supports a more restrictive definition than this. Additionally, the specification of the '564 Patent discloses at Col. 32, ln. 65 – 67: "The user interface of the present invention can be free loaded in a mobile phone. This represents a great convenience and cost saving." This illustrates that the inventor envisioned users downloading the app onto their phones for free. Finally, while not dispositive or even necessary for construing this term, the Merriam-Webster dictionary defines preload as "to load in advance and especially at a time removed from that of use."

The patentee merely used the term preloaded in its ordinary and customary way – loaded prior to use. As such, the term "preloaded in a mobile device" is readily discernable and does not

76

need construction. However, should the Court deem that construction is required, Vaxcel respectfully submits that the proper construction should be "**Loaded in a mobile device prior to the APP being used for setting an operating parameter**."

### ii. Defendant's Answering Position

"Preloaded" with respect to computing devices is a term of art with the ordinary and customary meaning of "loaded before the device is purchased or first used." Many sources confirm this understanding. JA-000275-76 ("to load information or a program onto a computer *before it is sold or used*"); JA-000278 ("of software, *already installed on a personal computer at the time of purchase*"); JA-000280 ("Load beforehand. *'the software comes preloaded on the PC'*"); JA-000282-85 ("pre-installed software is *software already installed and licensed on a computer or smartphone* bought from an OEM" … "the practice is not limited to personal computers; mobile phones typically come with *pre-loaded software* provided by its manufacturer or service provider"). There is no disclosure in the specifications that contradict this customary meaning. A POSITA would have no reason to believe it means anything else.

Vaxcel ignores not only this well-known meaning, but also reads the "pre" out of "preload." There is no daylight between the meaning of "load" and Vaxcel's construction, because it is axiomatic that software must be loaded before it can be used. Instead, Vaxcel cites a single statement in one specification that does not even use the term "preloaded," but "free loaded." *Supra* at 76; '564 Patent at 31:65-66. It is not clear what this means, but even if it were referring to "preloaded,"[15] it would still not support Vaxcel's construction. Vaxcel's cited statement says

---

[15] Vaxcel does not argue this is a typographical error and it therefore is not relevant to the meaning of "preloaded." In any event, the patentee did not file a certificate of correction with respect to "free loaded," yet it filed certificates of correction spanning *seven pages* (JA-000287-304) for this same patent. Further, it is not apparent that this is a typographical error at least because the cited portion is a discussion of the "user interface," not the "APP," and every other mention of

nothing about the time at which the "user interface" is loaded in the mobile device. It merely extols the benefits of using a mobile device instead of a "separate remote controller." *Id.* at 31:65-32:16. "There are only two exceptions" to the rule that claim terms "are generally given their ordinary and customary meaning": 1) when the patentee "acts as his own lexicographer;" and 2) when the patentee disavows claim scope during prosecution. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Vaxcel argues neither of these, and neither apply, as there was no such disavowal, and "[t]o act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" with a clearly expressed intent to redefine the term. *Id.* The patentee did not do so. This well-known term of art must be afforded its plain and ordinary meaning of "loaded before the device is purchased or first used."

### iii.   Plaintiff's Reply Position

HeathCo's arguments with respect to the term "preloaded in a mobile device" similarly fail. Here, HeathCo provides definitions from various dictionaries that define "preload" as "load beforehand" and then highlights the fact that the exemplary use in a sentence may include being preloaded on a computer to support its allegation that preload must mean loaded prior to purchasing the mobile device. However, the definition is "simply load beforehand." (*See, e.g.*, JA-000365-69: "Load beforehand"; JA-000370-80: "to bring in ahead of time"; JA-000381-84: "Load beforehand"). If a person loads an APP before purchasing the light that can be considered preloaded. If the person loads the APP onto the device before opening the box in which the light arrives that is also preloaded. If the person loads the APP onto the device before connecting the light to the power source, that is also preloaded (i.e., loaded beforehand). The claims do not require

---

"preloaded" (or "pre-loaded") is about the "APP" (*id.*, 1:48-56, 24:3-8, 28:29-33, 32:33-36, cls. 1, 9-10, 29, 36, 44, 56, 63). Vaxcel should not be permitted to "correct" its disclosure now.

the APP be preloaded prior to final manufacture of the device or prior to purchasing the device or prior to "plugging in" the device; instead the claim requires an APP preloaded in a mobile device to enable the process steps recited in the claim.  Thus, HeathCo's definition is too restrictive as it would omit at least each of these valid examples.

In light of the above, the Court should reject HeathCo's proposed construction and accept Vaxcel's proposed construction.

### iv.    Defendant's Sur-Reply Position

Vaxcel's own definitions betray its position.  Its Ex. V7 (JA-000371-80) provides the following example of "preload" in a sentence: "Google says its agreements with mobile carriers reduce the prices people pay for phones and allow carriers and device makers to *preload* their own or other competing apps and app stores."  Clearly this refers to apps loaded prior to purchase of the mobile device, which is confirmed by the article this statement comes from.  JA-000389-93. Its Ex. V8 (JA-000382-84) has a similar example: "the camera comes preloaded with a 24-exposure film."  Again, this clearly refers to loading prior to purchase because it ***comes with*** the film.  Vaxcel's Ex. V6 (JA-000366-69)  is inapposite.  It redirects to "buffering," which states: "Preloading ***data*** into a reserved area of memory (the buffer)."  JA-000395-98 (emphasis added). The '564 and '367 Patents claim "a user interface ***APP*** comprising at least one free setting algorithm preloaded in a mobile device."  '564 & '367 Patents, cl. 1 (emphasis added).  Data is used within an app.  Loading data in the form of buffering is done by the user, since it is the user requesting that data.  Even if this definition were relevant, one definition does not override the four provided by HeathCo nor the two provided by Vaxcel that support HeathCo's construction, not Vaxcel's.

### n.    **"When a Free Setting Motion of the Free Setting Operator is Ceased, the User Interface APP Manages to Generate the [At Least One] Operating Variable Corresponding to [the Selection of] the Capacity Operating Rate [Being**

**Determined] and Accordingly Operates to Transmit a Wireless Instruction Signal Carrying a Message of the [At Least One] Operating Variable to the Lighting Device"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| H. **When a Free Setting Motion of the Free Setting Operator is Ceased, the User Interface APP Manages to Generate the [At Least One] Operating Variable Corresponding to [the Selection of] the Capacity Operating Rate [Being Determined] and Accordingly Operates to Transmit a Wireless Instruction Signal Carrying a Message of the [At Least One] Operating Variable to the Lighting Device** '564 Patent, claim 1 '367 Patent, claim 1 | No construction is necessary. However, if it is deemed that a construction is required then the construction should be: As a result of the free setting motion of the free setting operator being ceased, for example, after a user removes their finger from a virtual button, the user interface app generates the operating variable corresponding to the selection of the capacity operating rate and transmits a wireless instruction signal carrying a message of the operating variable to the lighting device | The moment when the free setting motion of the free setting operator is ceased, for example, the moment a user removes their finger from a virtual button, the user interface app generates the operating variable corresponding to the selection of the capacity operating rate and transmits a wireless instruction signal carrying a message of the operating variable to the lighting device |

i.      **Plaintiff's Opening Position**

The only actual disagreement between the parties relates to the portion of the term relating to the word "when." Vaxcel asserts that the plain meaning of the term "when" merely means as a result of or at the conclusion of. This language is supported by the fact that in at least one embodiment disclosed in the '367 and '564 patents the user must hit a save button after removing their finger from the touch screen before the app generates the operating variable. (D.I. 64-2 Exhibit I, Col. 30, ln. 62 – Col. 31, ln. 2: "In step 917 the user confirms acceptance of the locked in value of capacity operating rate by pressing the Save button.") Thus, the language of the claim

does not prevent an intervening action between the user removing their finger from the touch screen and the App generating the operating variable. However, HeathCo's proposed construction attempts to do just that – improperly remove the possibility of an intervening act of hitting a save button.

Vaxcel submits that the plain language of the claim and the specification makes the meaning of this claim term readily discernable and thus no construction is required. However, should the Court deem otherwise, Vaxcel respectfully submits that the correct construction should be "**As a result of the free setting motion of the free setting operator being ceased, for example, after a user removes their finger from a virtual button, the user interface app generates the operating variable corresponding to the selection of the capacity operating rate and transmits a wireless instruction signal carrying a message of the operating variable to the lighting device**."

### ii.    Defendant's Answering Position

The parties dispute only the meaning of "when" in this term, i.e., the timing of the claimed variable generation and message transmission. The intrinsic and extrinsic evidence support HeathCo's construction that this timing must happen at the moment when the "free setting motion" is ceased.

The claim limitation (underlined below) in context is as follows:

> wherein ***when the free setting operator is activated*** by the user to interact with the capacity scale simulator, the user's interface APP responsively manages to select or compute the value of the capacity operating rate according to the ***instantaneous state of interaction*** between the free setting operator and the capacity scale simulator with the indicator of the capacity operating rate ***simultaneously showing an instantaneous value*** of the capacity operating rate … wherein when a free setting motion of the free setting operator is ceased, the user interface APP manages to generate the operating variable corresponding to the selection of the capacity operating rate and accordingly operates to transmit a wireless instruction signal carrying a message of the operating variable to the lighting device.

'564 Patent at 34:21-39 (cl. 1) (emphasis added); *see also* '367 Patent at 34:22-42 (cl. 1).  That is, when, for example, the user drags a slider across a percentage bar ("when the free setting operator is activated…"), it ***instantaneously*** computes the value (e.g., a virtual track corresponding to a brightness percentage) and ***simultaneously*** shows that ***instantaneous*** value to the user.  It follows that the next use of "when" in the claim has the same meaning – it ***instantaneously*** generates the operating variable and transmits it.

The specification supports this understanding.  In a discussion about the subject of this claim limitation – the user interacting with the capacity scale simulator (e.g., sliding a finger across a virtual track) to transmit the result to the lighting device – it is clear that the claimed variable generation and transmission happens at ***the moment*** when the movement ceases:

> During a free running cycle period, the instantaneous value of the changing capacity operating rate is simultaneously shown in the indicator 74 of the capacity operating rate, wherein the value of capacity operating rate can be an operating percentage or an absolute operating value of the operating parameter, wherein ***<u>the moment</u> at which the user's finger 5 is removed from the virtual button 72, the free running motion is <u>instantly ceased</u> with the capacity operating rate thereby being locked in at the <u>instant level of the last moment</u> of the free running motion…. When a setting decision is made, the user interface APP manages to transmit via the mobile device wireless instruction signals*** to the security light to set the operating parameter.

'564 Patent at 29:38-62, '367 Patent at 29:24-48 (emphasis added).  The "setting decision" is the motion ceasing: "when a free setting motion of the free setting operator is ceased with at least one setting decision…" '564 Patent at 4:11-18, '367 Patent at 4:13-20.  Therefore, at ***the moment*** when the user removes her finger, the capacity operating rate is locked in—the "setting decision"—and the instruction is transmitted to the light.

Dictionary definitions of "when" support HeathCo's construction.  HeathCo provides definitions from six dictionaries that define "when" as including "at what time," "at the time that," and/or "at the time at which."  JA-000015-19, 306-333.  Some definitions include "just at the

82

moment that." JA-000015-19, 314-16. At least one definition includes "at the time that something else happens" and variations "as soon as another action or event has finished" and "at the same time as something else." JA-000318-323.

Vaxcel's argument relies solely on the embodiment of Fig. 10A, which allows a user to press a "Save" button to "accept[] the locked in value of capacity operating rate." *Supra* at 80; '564 Patent at 30:62-66. But this embodiment is not necessarily covered by the claims in question as there is no "free setting *motion* of the free setting operator." As the specification explains:

> [T]he only difference between [the embodiments of] FIG. 8A and FIG. 10A is the implementation method for free setting the capacity operating rate. FIG. 8A illustrates the virtual *track* method by *sliding* a free setting operator 71 along a virtual track 75…providing the instantaneous value of capacity operating rate while the *motion* is being conducted…. FIG. 10A illustrates the virtual *button* method by continuously *touching* a virtual button 72 [where] the user is able to instantly choose a time point to *de-touch* the virtual button 72 to lock in a free running capacity operating rate."

'564 Patent at 30:21-37 (emphasis added); *see also id.* Fig. 10A. In fact, Vaxcel's own construction would not cover this embodiment either. It requires that transmission of the wireless instruction signal occur "as a result of a free setting motion of the free setting operator being ceased." But in this embodiment, it is transmitted as a result of the "Save" button being pressed.

### iii.    Plaintiff's Reply Position

HeathCo's argument is logically flawed and must be rejected. On the one hand, HeathCo argues that the definition of "when," as used the second instance in the claim, should have the same definition as the first use of when ("wherein **when** the free setting operator is activated by the user to interact with the capacity scale simulator, the user's interface APP responsively manages to select or compute the value of the capacity operating rate according to the instantaneous state of interaction between the free setting operator and the capacity scale simulator with the indicator of the capacity operating rate simultaneously showing an instantaneous value of the capacity

83

operating rate"). Clearly this first use of "when" means "during the entire time that the free setting operator is interacting with the capacity scale simulator." However, HeathCo then emphasizes various "instantaneous" and "simultaneous" operations **performed by the user's interface app** such as "select[ing] or comput[ing] the value… according to the instantaneous state of interaction between the free setting operator and the capacity scale simulator," and shifts its position 180 degrees and asserts that the second use of "when" should mean instantaneously. This is another non sequitur.

In addition to the above, it should be noted that in the claim language highlighted by HeathCo, every time something occurs instantaneously, the claim employs the word "instantaneously." However, in the portion of the claim at issue, the claim simply recites "manages to generate …" HeathCo must improperly add the word "instantaneously" to the claim for the claim to conform with its asserted construction.

In light of the above, the Court should reject HeathCo's proposed construction and accept Vaxcel's proposed construction.

### iv.    Defendant's Sur-Reply Position

Vaxcel argues, without any support, that "[c]learly this first use of 'when' [in the claim limitation] means 'during the entire time that the free setting operator is interacting with the capacity scale simulator.'" *Supra* at 83. But the plain language is centered about instantaneous and simultaneous actions, i.e., events that occur at the moment of interaction. Thus, this use of "when" also means "at the moment that" the free setting operator is activated, since during each moment of interaction, the app computes the instantaneous state (i.e., the state at *that instant*) and simultaneously shows the instantaneous value (i.e., at *the same instant*).

Vaxcel also argues that because the claim does not say "*instantaneously* manages to generate," it is contrary to HeathCo's position. But the "instantaneous" language is about the state

84

85

of interaction between the user and app rather than what the app is doing at a particular time. In any event, the lack of inclusion of a word cannot override the clear disclosure in the specification that supports HeathCo's construction.

## V.    CONCLUSION

**Plaintiff's Position:** Vaxcel respectfully submits that the claim constructions it has proposed above are faithful to the intrinsic evidence; namely, the claims themselves, the specification, and the prosecution history of each of the Suit Patents. Vaxcel also submits that the intrinsic evidence alone resolves any ambiguity thus rendering it unnecessary to rely on any extrinsic evidence other than to further support the intrinsic evidence.

**Defendant's Position:** For the foregoing reasons, HeathCo's proffered constructions should be adopted.

*/s/ Katharine Lester Mowery*

Frederick L. Cottrell III (#2555)
Katharine Lester Mowery (#5629)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
mowery@rlf.com

*Attorneys for Plaintiff Vaxcel International
Co., Ltd.*

OF COUNSEL:
R. Mark Halligan
FisherBroyles, LLP
203 North LaSalle Street, Suite 2100
Chicago, Illinois 60601
(312) 607-0102
rmark.halligan@fisherbroyles.com

Richard M. Lehrer
FisherBroyles, LLP
109 Normandy Drive
Woodstock, GA 30188
(845) 519-9525
Richard.lehrer@fisherbroyles.com

Dated: July 19, 2021

*/s/ Stephen B. Brauerman*

Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Defendant HeathCo LLC*

OF COUNSEL:
David C. Radulescu, Ph.D.
Etai Lahav
Michael Sadowitz
Radulescu LLP
5 Penn Plaza, 19th Floor
New York, NY 10001
(646) 502-5950
david@radip.com
etai@radip.com
mike@radip.com

86